**P. D. MARCHESSINI & CO. (NEW YORK), Inc., Libelant,**

v.

**H. W. ROBINSON & CO., Inc., Respondent.**

**No. 62 AD 223.**

United States District Court
S. D. New York.
Dec. 5, 1967.

---

8. See Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

9. M.R.Civ.P., Rule 44.1.

Poles, Tublin, Patestides & Stratakis,
New York City, for libelant; John G.

Poles, Theodore P. Daly, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for respondent; John H. Cleveland, III, Charles Grice McMullan, Jr., New York City, of counsel.

## MEMORANDUM

COOPER, District Judge.

Libelant, P. D. Marchessini & Co. (New York) Inc. (hereinafter Marchessini), has brought this libel against respondent, H. W. Robinson & Co., Inc. (hereinafter Robinson), alleging breach of a contract of carriage (Ex. 1A)[1] involving 260 locomotive trucks[2] which were to be carried aboard vessels operated by libelant.

Respondent asserts the lack of actual or apparent authority on the part of the signatory to bind Robinson contractually, fraud in its inducement, and that the document is not a complete integration of the agreement.

## THE FACTS

Eugene Holzapfel, head of Robinson's sales department, testified that in the fall of 1961[3] he received a phone call from a Mr. Hiroshima of Hitachi & Company requesting an ocean freight rate on locomotive trucks to be shipped abroad (Tr. 241–242, 245, 248). Holzapfel brought this matter to the attention of James Engers, President of Robinson, and Edward Boyens of Robinson's export department (Tr. 250); the latter made phone inquiries to five or six different steamship carriers for a freight quotation. Dominic (hereinafter D.)

Jordan of Marchessini's traffic department received Boyens' call and quoted him an ocean freight rate on locomotive trucks; Boyens responded that it was a large shipment, and he required a better rate than that provided by Marchessini's tariff (Tr. 79–80). D. Jordan discussed the rate with Salvatore (hereinafter S.) Jordan, Marchessini's General Traffic Manager, and, using the facts and figures supplied by Boyens, they arrived at a freight rate of $775 per unit (Tr. 80). Boyens, when informed of this new quotation by D. Jordan, said he would let him know if they had a booking (Tr. 81–82).

The Marchessini quotation was passed on to Holzapfel (Tr. 50) who called and informed Hiroshima of this freight rate (Tr. 255). Hiroshima in turn agreed to let Holzapfel know if this business developed for Hitachi & Company. Holzapfel called Hiroshima a second time, approximately a month later, and made inquiry concerning these locomotive trucks. Hiroshima indicated that the business had not yet materialized and again agreed to call if it did in fact develop (Tr. 255–256). Holzapfel heard nothing further from Hiroshima concerning this shipment (Tr. 257).

S. Jordan testified that on December 14, 1961 Boyens called and informed him that the cargo was going to move (Tr. 170). S. Jordan had the contract prepared, and directed Edwin O'Brien, one of Marchessini's traffic representatives, to take it to Robinson's office for Boyens' signature (Tr. 170–171). Boyens signed[4] and affixed the Robinson company name stamp[5] to the document (Tr.

---

1. "Ex." followed by a number or letter refers to an exhibit in evidence. "Tr." followed by a number refers to pages of the transcript of trial proceedings, October 3, 4, and 9, 1967.

2. Delivery was to be made as follows: "30 units during Jan., 1962" and "40 units each month thereafter until completion of the contract." (Ex. 1A).

3. James Engers testified that it was the last week of October, 1961 (Tr. 272).

4. Boyens testified, by way of deposition dated February 27, 1964, that he signed the document after being assured by O'Brien that it would not bind Robinson for the actual cargo, but was merely to protect the rate when and if the cargo did move (Tr. 34–36).

   O'Brien, in his deposition dated March 6, 1964, denied ever having made such a statement (Tr. 136).

5. Boyens testified that the Robinson stamp was placed on the document after he

10). O'Brien returned it to Marchessini's office where it was then signed by libelant's Outward Traffic Manager, Thomas Giardino (Tr. 198), and a copy mailed back to Robinson, attention of Boyens (Tr. 223). Libelant's tariff was then amended to reflect the $775 per unit rate (Tr. 84, 176–181), and its contract with Maher Stevedoring was amended to reflect a rate, based on the volume of this shipment, of $40 per unit (Tr. 85–89, 183–184).

The first shipment comprising 30 units was to be carried aboard the "Eurylochus" scheduled to sail on January 27, 1962 (Tr. 174). As the sailing date approached with no cargo delivered, S. Jordan sent O'Brien, on at least three separate occasions, to discuss with Boyens how and when the cargo was moving to the pier. During these talks, Boyens furnished O'Brien with a copy of a memorandum (Ex. 2), a letter (Ex. 3), and a specification sheet (Ex. 4) [6]— papers purporting to explain the delay and indicate how the cargo would be delivered in the future (Tr. 127–130, 139–142, 173–176).

Respondent has not in fact shipped on libelant's vessels any of the cargo described in Exhibit 1A (Pre-Trial Order, April 20, 1965).

## EVIDENTIARY RULINGS

During the reading of Boyens' deposition, respondent offered in evidence a handwritten document dated February 21, 1962, addressed "To Whom It May Concern" and signed by Edward C. Boyens (Ex. A). Boyens, in his deposition, identified the document by testifying that it was in his handwriting and signed by him (Tr. 53). The contents of this document, for the most part, purport to explain the circumstances under which Boyens signed the alleged con-

tract. Libelant objected to its admissibility on the grounds that it was self-serving and violated the parol evidence rule (Tr. 53–54, 57–58). This Court received the document in evidence subject to reconsideration.

After a close reading of the document in question, we conclude that it is hearsay and unworthy of admission as affirmative proof of the assertions contained within it. Further, as to its admissibility as an aid in judging deponent's veracity, the document amounts to a prior consistent statement, and thus, far from impeaching Boyens' testimony, serves only to reinforce and bolster it. We therefore strike respondent's Exhibit A from evidence.

During the direct examination of S. Jordan, libelant offered in evidence a copy of the tariff page filed by Marchessini with the Federal Maritime Commission (Ex. 5), and a copy of the amendment to the stevedoring contract between Marchessini and Maher Stevedoring. Respondent's counsel, after voir dire examination of S. Jordan, indicated to this Court that he had no objection to the admissibility of Exhibit 5 into evidence (Tr. 178–181). However, at the time he objected to the admissibility of the amendment to the stevedoring contract, he raised the point that neither the amendment nor Exhibit 5 were listed in libelant's Pre-Trial Memorandum as exhibits to be introduced during the trial, and therefore moved that they be excluded (Tr. 185–188). We find such objection to Exhibit 5, made after withdrawal of a prior objection and after admission of the document into evidence, to be untimely, and accordingly deny the motion to strike it from evidence.

As for the amendment to the stevedoring contract, this Court instructed counsel for libelant to withhold

---

signed it and only after O'Brien requested it be so affixed (Tr. 10).

O'Brien agrees that he requested the company stamp be placed on the document, and that it was so affixed after Boyens signed it (Tr. 138).

6. In his deposition, Boyens in effect states that Exhibits 2, 3, and 4 are fictitious; that they were prepared as a personal favor to O'Brien (Tr. 27, 32, 40, 42).

O'Brien testified that at the time he received Exhibits 3 and 4 he did not know they were fictitious (Tr. 153).

his offer and renew it at a later time (Tr. 191). During the remainder of the trial, no formal offer as to this document was ever renewed. Accordingly, we deny libelant's request, raised only by post-trial memorandum, to receive this document in evidence.[7]

## ACTUAL AUTHORITY

Edward Boyens was supervisor, or manager, of Robinson's export department (Tr. 9, 264–265). One of his duties was the "booking" of cargo with steamship companies (Tr. 264, 359, 361).[8] The term "booking" has reference to an oral engagement of space, entered into over the telephone, by which a freight forwarder, such as Robinson, agrees to ship, and a steamship company, such as Marchessini, agrees to carry, designated cargo (Tr. 99–100, 355–358, 376). In essence, it is a reservation of space for the carriage of freight. The signing of a written contract of carriage (also referred to as a "booking contract," "booking note," and "contract of affreightment") is not necessarily an element of the "booking" (Tr. 375–376).

A party who seeks to charge a principal with the contract made by his agent must prove the agent's authority. Bogue Elec. Mfg. Co. v. Coconut Grove Bank, 269 F.2d 1 (5th Cir.1959); Johnson v. Mosley, 179 F.2d 573 (8th Cir. 1950). Libelant has sought to sustain this burden by equating oral "bookings" with the signing of written contracts of carriage, concluding that both are equally binding (Libelant's Post-Trial Memorandum, p. 34). The testimony of libelant's own witnesses refutes such contention.

S. Jordan testified that it was Marchessini's policy to prepare, and mail to the interested party, a booking contract whenever a phone call was received outlining cargo requirements (Tr. 203–205).[9] Further, unless these contracts were returned signed, Marchessini had no obligation to hold the space for the freight forwarder (Tr. 222). Such testimony conclusively establishes that Marchessini never considered itself bound by an oral "booking."

Additionally, Boyens was instructed, at the time of his employment by Robinson, not to sign contracts of any type (Tr. 293), and specifically with regard to contracts of carriage, that it was Robinson's policy never to sign them (Tr. 297); if requests so to sign were received, the steamship company involved was to be advised that the contract would be forwarded to the actual shipper for signature (Tr. 297–298).

We find the proof unconvincing, the burden not sustained, and accordingly, Boyens was without actual authority to sign this contract on behalf of Robinson.

## APPARENT AUTHORITY

In order to find apparent authority, libelant must show this Court "that the principal has either so conducted his business as to give third parties the right to believe that the act in question is one he has authorized his agent to do, or that it is one agents in that line of business are accustomed to do." Brownell v. Tide Water Associated Oil Co., 121 F.2d 239, 244 (1st Cir. 1941), quoting Davison v. Parks, 79 N. H. 262, 263, 108 A. 288, 289 (1919). See Masuda v. Kawasaki Dockyard Co., 328 F.2d 662 (2d Cir.1964); Dr. Beck & Co. v. General Elec. Co., 210 F.Supp. 86 (S.D.N.Y.1962), aff'd, 317 F.2d 538 (2d Cir.1963); Restatement (Second), Agency § 27, comment a (1958). The

---

7. We note that the testimony of D. and S. Jordan is sufficient by itself to convince us that the stevedoring contract was in fact amended in anticipation of receiving this cargo.

8. Engers limited it to "routine bookings" (Tr. 359, 361).

9. O'Brien also testified that it was Marchessini's practice to send out booking contracts to its customers and ask that they be signed; during October, November, and December of 1961, Marchessini insisted upon freight contracts on all cargo (Tr. 132–134).

third party must be justified in his belief that the agent was acting within the scope of his authority; the standard should be that of a reasonable man in the position of the third party. See Brownell v. Tide Water Associated Oil Co., supra; McNutt Oil & Refining Co. v. Mimbres Valley Bank, 174 F.2d 311 (10th Cir.1949); Restatement (Second), Agency § 8, comment c (1958).

■ Libelant bases its allegation of apparent authority on Boyens' position as supervisor, or manager, of Robinson's export department.[10] It has endeavored to establish, through the testimony of both D. and S. Jordan, that a person in such position customarily has authority to enter into written booking contracts (Tr. 92, 166–67), and in that way justify its own reliance on Boyens' position. We find the testimony insufficient to convince us that employees in similar positions were authorized to sign booking contracts on behalf of their employers, especially a booking contract where the freight involved amounted to $201,500 (Tr. 215).

We need not rest on this failure of proof alone, for there are other factors present which clearly would have put a reasonable man on inquiry.

The extent of Marchessini's inquiry into Boyens' authority amounts to a reference to the "Transportation Telephone Tickler," a publication commonly used in the trade, wherein Boyens' name was listed after "Export Department" (Tr. 212–213; Ex. G–1).[11]

Aside from conversations with Boyens, neither D. nor S. Jordan made inquiry of any officer or employee of Robinson as to Boyens' authority (Tr. 106, 212–213). In fact, until the time Boyens called on December 14, 1961, S. Jordan had never spoken with him (Tr. 172, 201), and the extent of D. Jordan's contact with Boyens only dates back to the spring of 1961 (Tr. 91). The absence of appropriate inquiry is pointed up when the following factors are considered.

Firstly, this shipment involved 260 locomotive trucks, to be shipped over a seven month period, bearing freight charges of $201,500. S. Jordan referred to it as a "very good size" sum (Tr. 215), and Engers testified it was not a routine shipment but rather "one out of the ordinary" for Robinson (Tr. 361–362). Surely, with freight charges amounting to a sum so large and unusual in the course of the business relations of the parties, a reasonable man would have made inquiry into the actual authority of an employee before accepting his signature to a contract purporting to bind the employer. A mere phone call to one of Robinson's officers might have sufficed.

Secondly, past dealings between the two companies were such that Marchessini should have been on notice that it was Robinson's practice not to sign booking contracts. Boyens testified he booked "millions of pounds" of cargo on libelant's vessels (Tr. 20); Engers doubts it was millions, but feels it was a considerable amounts—"a hundred thousand pounds" (Tr. 353). In either event, there were substantial past dealings, and throughout such dealings Marchessini maintained a policy of obtaining, or attempting to obtain, signed booking contracts from freight forwarders (Tr. 203–205, 222).[12] Yet, with one possible exception,[13] there is no evi-

---

10. Libelant's contention, that Boyens had, in the past, contracted orally on Robinson's behalf, and therefore Marchessini was justified in believing that he could so contract in writing, has already been refuted. See p. 732 supra.

11. Contrary to S. Jordan's testimony (Tr. 212), the publication does not expressly refer to Boyens as export manager. However, as already set forth, we find Boyens was in fact supervisor, or manager, of Robinson's export department.

12. See p. 732 supra.

13. Aside from the alleged contract in suit, Boyens testified that on one previous occasion he signed a booking note similar to Exhibit 1A; it was signed, H. W. Robinson as agents for Delph Weiller International. This was done only after

dence that Robinson ever signed a booking contract with Marchessini or for that matter with any other steamship carrier.[14] Such fruitless attempts to bind respondent in writing were sufficient to put Marchessini on notice that Robinson did not ordinarily sign such contracts; at the very least, it pointed up to libelant that further inquiry was in order.

Thirdly, a freight forwarder, such as Robinson, generally does not own cargo; the shipments it handles are for the account of others (Tr. 104, 163). Libelant's Traffic Manager, S. Jordan, testified that he doubted a freight forwarder would own cargo on which freight of $201,500 was to be collected—"that is a large sum for a freight forwarder to have in the first place" (Tr. 217a–218). In essence, Robinson was simply acting as agent. Such knowledge would cause a reasonable man in libelant's position to make further inquiry.[15]

Libelant has failed to convince this Court that it was justified in its belief that Boyens possessed authority to sign this booking contract on behalf of Robinson.

## CONCLUSION

Boyens possessed neither actual nor apparent authority to sign this booking contract on Robinson's behalf. This disposition obviates the need to discuss respondent's other defenses.

Judgment for respondent.

The foregoing shall constitute this Court's Findings of Fact and Conclusions of Law as required by Rule 52, F. R.Civ.P.

So ordered.

---

written authorization was obtained from the client to sign on its behalf (Tr. 20–22). We note, however, with the exception of Exhibit 1A, libelant did not offer in evidence any booking contract signed by Robinson.

14. Engers testified that Robinson does not sign booking notes (Tr. 378).

15. Exhibit 1A was not signed "H. W. Robinson as agent for (a designated shipper)." We recognize S. Jordan's testimony to the effect that booking contracts are sometimes returned with only the forwarder's name appearing, without indication of the principal (Tr. 163, 165). Still, circumstances warranted further inquiry.