E.F. HUTTON & CO., INC., Plaintiff,

v.

FIRST FLORIDA SECURITIES, INC., Defendant.

FIRST FLORIDA SECURITIES, INC., Third-Party Plaintiff,

v.

Perry CONSTANTINOU and M. Perry Grant, Third-Party Defendants.

85 Civ. 5551 (WCC).

United States District Court, S.D. New York.

Feb. 25, 1987.

Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for plaintiff; Harry Frischer, Rob J. Crichton, of counsel.

Tenzer, Greenblatt, Fallon & Kaplan, New York City, for defendant and third-party plaintiff; Ronald L. Mayers, William M. Pinzler, Judah S. Shapiro, of counsel.

Cooper Cohen Singer & Ecker, New York City, for third-party defendant Perry Constantinou; Barry H. Singer, of counsel.

Bernstein & Gershman, Garden City, N.Y., for third-party defendant M. Perry Grant; Marshall A. Bernstein, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This opinion incorporates the Court's findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P., following a two-day bench trial to determine liability for the purchase of 25,000 shares of the common stock of Keystone Medical Corporation ("Keystone"). The controversy arose due to a drop in the price of the stock from approximately $15 per share when ordered on April 29, 1985 to approximately $7 per share when payment was due. The stock was purchased by defendant/third-party plaintiff First Florida, which contends that this purchase was made on behalf of its customer, third-party defendant M. Perry Grant ("Grant"). While Grant himself did not place this order with First Florida, First Florida alleges that Grant had authorized third-party defendant Perry Constantinou ("Constantinou") to place the order for him and that Grant confirmed the order directly with First Florida on April 30, 1985. Grant, on the other hand, denies having authorized Constantinou to place the order and denies that he ever confirmed the trade with First Florida.

While there is a sharp dispute over whether Grant did or did not authorize the purchase of the Keystone shares, there is no dispute as to the circumstances by which Hutton was forced to pay for the Keystone stock. On May 7, 1985, First Florida delivered the Keystone shares to Hutton through the Depository Trust Company ("DTC"), a clearing house used by the securities industry for electronic transfers of stock and funds. Despite the fact that by May 7, 1985 First Florida admits knowing that Grant had denied authorizing the trade, First Florida delivered the stock to

Hutton for the account of Grant—who maintained accounts at both First Florida and Hutton—as a "delivery versus payment" ("DVP") against Grant's account at Hutton.

Under DTC procedures, payment for stock transmitted through DTC is automatic and on May 7, 1985, Hutton's account at DTC was debited in the amount of $353,875 and First Florida's account was automatically credited with a like amount. After receiving the Keystone stock from First Florida, Hutton followed its standard procedures to determine whether it had instructions from its customer to accept that stock. Upon doing so, Hutton learned that Grant had not authorized Hutton to accept the stock, denied having placed the trade with First Florida and did not have enough funds in his Hutton account to pay for the stock. Consistent with both DTC procedures and industry custom and practice, on May 8, 1985, the very next day, Hutton "reclaimed" the stock to First Florida, i.e. sent the stock back to First Florida through DTC. Upon receipt of the Keystone shares from Hutton, First Florida redelivered them to Hutton. For the next one and one-half months Hutton and First Florida sent the stock back and forth to one another in what several witnesses at the trial described as analogous to a game of ping-pong. On June 24, 1985, while the stock was in Hutton's account, DTC informed Hutton that First Florida had withdrawn as a member of DTC and had closed its account. Thus, Hutton was left holding the stock, which had declined precipitously in value, and First Florida had Hutton's funds.

In this action, Hutton seeks to recover its loss from First Florida. First Florida, in its third-party claims, seeks to recover judgment from either Constantinou, who placed the purchase order with First Florida, or Grant, the person for whom Constantinou claims he placed the trade. The credible evidence presented at trial convinces the Court that Grant did not authorize Constantinou to purchase these shares on his behalf. Indeed, the evidence showed that Constantinou was engaged in a con-certed effort over a period of time to manipulate the price of Keystone stock by issuing orders for the purchase of large blocks of that stock, both in his own name and in the name of others, so that those persons who held substantial short positions in Keystone would have difficulty covering their positions and the price of Keystone stock would rise dramatically. The evidence showed that on April 29, 1985 Constantinou purchased through First Florida the 25,000 Keystone shares at issue here as part of this manipulative scheme. After First Florida made the purchase, Constantinou instructed First Florida to send the stock to Grant's Hutton account on a DVP basis. This was all done at the same time that Grant was selling all of the Keystone shares which he had previously purchased for his and his mother's accounts at Hutton.

In July 1983 Grant and several other members of his family, including his mother Muriel, opened securities accounts with Hutton's office in Stamford, Connecticut. The Grants' broker was Alan Gramaglia. Grant authorized First Florida to make two purchases of Keystone stock, and authorized Hutton to pay for those shares, before the delivery to Hutton of the 25,000 Keystone shares that are in dispute. On April 8, 1985, Grant authorized the purchase by First Florida of 50,000 shares of stock in Keystone for the account of his mother Muriel Grant. And on April 15, 1985, Grant authorized Hutton to accept a DVP delivery of 20,000 shares of Keystone stock for his own account. Gramaglia testified that these two trades were the only trades in Keystone as to which Grant authorized Hutton to accept a DVP delivery (Tr. 13). That evidence was uncontested.

On May 7, 1985, First Florida delivered to Hutton the 25,000 shares of Keystone that are at issue in this case (Stipulated Fact No. 19). As noted, the undisputed evidence established that Hutton was not informed that this delivery was coming and had no instructions from Grant to pay for the stock, and that Grant did not have

sufficient funds in his Hutton account to cover the purchase.

Hensley Munn, Hutton's First Vice President in charge of the Cashiering Control Department, testified as to Hutton's procedures and industry custom and practice with respect to securities sent to Hutton via DTC. He also testified as to the specific manner in which Hutton dealt with the 25,000 shares of stock delivered to Hutton on May 7, 1985.

Munn explained that DTC is a mechanism for the electronic transmission of securities from one brokerage firm to the other (Tr. 49). Under DTC procedures, payment for stock sent through the clearing house is immediate and automatic. When one firm sends securities to another, DTC automatically deducts monies from the account of the firm which received the securities and credits the funds to the account of the firm that sent the securities.

Since the transfer of funds in a DTC transaction is automatic, industry custom and practice as well as DTC rules permit a broker to undo or "reclaim" a DVP delivery which it had no instructions to receive and for which it had no authorization to make payment (Tr. 51–52). Munn explained that when a security is delivered to Hutton through DTC the cashiering control department is responsible for making the necessary inquiries to see whether Hutton had any instructions to receive the security or make payment for it. If Hutton had no such instructions, the security would then be reclaimed to the broker which sent it.

As noted, on May 7, 1985, First Florida delivered the Keystone stock to Hutton and First Florida automatically received payment of $353,875, the price of that stock. The next day, May 8, the cashiering control department, or cage, noted that it had no instructions to take in the stock and contacted Gramaglia, the broker listed on the DTC ticket, as part of the routine procedure for stock received by Hutton for which no instructions are immediately found (Tr. 23, 51).

Gramaglia testified that an individual in Hutton's New York office telephoned him on May 8 and asked him whether he was aware of 25,000 shares of Keystone being delivered to Grant's account for delivery versus payment. Gramaglia told him that he, Gramaglia, knew nothing about the trade and that Gramaglia would contact the client to see if he had made such a trade (Tr. 23). Shortly thereafter, Gramaglia spoke with Grant, who stated that he did not know of this transaction and instructed Hutton not to accept it because it had not been authorized (Tr. 23).

Following this conversation, Gramaglia and his branch manager spoke again to Hutton's New York office to instruct the cage not to accept delivery (Tr. 23–24) and sent confirming telex messages to the cage (Plaintiff's Exhibit 6). Gramaglia and his branch manager also prepared contemporaneous memoranda reflecting Gramaglia's conversation with Grant in which Grant had denied making the trade and instructions given by Gramaglia and his manager to the cage (Plaintiff's Exhibits 7, 8).

That same day, May 8, Hutton reclaimed the Keystone shares back to First Florida, indicating that Hutton did not know the trade (Tr. 59). Hutton's reclaim was made promptly and was consistent with DTC procedures and industry custom and practice, as set forth in Munn's uncontradicted testimony (Tr. 59–61).

Following Hutton's reclaim to First Florida, on May 8, First Florida redelivered the stock to Hutton (Tr. 59). On receipt of these shares from First Florida for the second time, Hutton placed them in a suspense account that it maintained for items that required further research (Tr. 59). This item came to Munn's personal attention on May 29 when he reviewed a computer report of items in the suspense account. On examining the paperwork relating to the events of May 8, Munn instructed a Hutton clerk to return the stock to First Florida yet again (Tr. 59–60).

Between May 29 and June 24 the Keystone stock was sent back and forth between Hutton and First Florida almost every day (Tr. 52, 60; Plaintiff's Exhibit 9).

On June 24, 1985, following an attempted redelivery of the shares from Hutton back to First Florida, DTC informed Hutton that First Florida had withdrawn its membership from DTC and had closed its account (Tr. 52-53, 60). Thus, Hutton was left holding the stock while First Florida had $353,875 of Hutton's funds. Munn was subsequently instructed to liquidate the Keystone stock (Tr. 62) which was sold between July 9, 1985 and August 2, 1985 for a total price of $130,625 (Stipulated Fact No. 22), resulting in a net loss of $223,250 to Hutton.

*Background to the Purchase in Dispute*

Grant testified at trial that he met Constantinou once, approximately fifteen years ago, and had no other contact with him until he was reintroduced to Constantinou in March 1985 by a mutual friend (Tr. 68-69). On several occasions in March and April 1985, Grant met with Constantinou at Constantinou's offices at 225 Park Avenue (Tr. 69). During their meetings, Constantinou discussed with Grant the possibility of Grant and his mother investing in Keystone (Tr. 77, 80). Constantinou told Grant that Constantinou and his business associates held a large position in Keystone (Tr. 70, 78). Constantinou himself testified that in his personal accounts he owned 90,000 to 100,000 shares of the stock (Tr. 289) and Constantinou's corporation, Worldwide Capital Corporation, owned a large number of restricted shares (Tr. 290). Constantinou explained to Grant that Constantinou was recommending the stock highly and encouraging friends, business associates and others to buy it (Tr. 289-90). During their early meetings, Grant observed Constantinou placing numerous buy orders for Keystone stock on behalf of himself and others, through several brokerage houses (Tr. 75-77).

The reason for Constantinou's hoarding of Keystone stock became evident at trial. Constantinou, Grant and Rikki Slovis, First Florida's office manager in New York, all testified about Constantinou's "war with the shorts" and his desire to ensure that insufficient Keystone stock would be available when those who were short had to cover their positions (Tr. 70, 80, 289-90, 205). Constantinou believed that if he and his friends could gain control of most of the outstanding shares, some of those who held short positions ultimately would be unable to cover and the price of Keystone stock would rise dramatically (Tr. 288-90).

Grant likewise testified that Constantinou discussed with him the war with the shorts on numerous occasions and encouraged Grant and his mother to purchase the stock by explaining how the price would rise when the shorts would be unable to cover their positions (Tr. 71, 80). Even Slovis heard Constantinou discussing his "war with the shorts" (Tr. 205).

In his effort to ensure that the shorts would be unable to obtain sufficient Keystone stock with which to cover, Constantinou did not stop at merely purchasing Keystone stock for his own account and encouraging others to purchase it. The evidence also showed that Constantinou—who was not a broker-dealer and who was, in fact, barred by the Securities and Exchange Commission from acting as such (Tr. 291-94)—actually placed buy orders for Keystone stock on behalf of numerous other persons, all in furtherance of his scheme to manipulate the market (Tr. 290, 203, 287, 75-76; Stipulated Fact No. 5).

Constantinou himself testified that he purchased Keystone shares on behalf of numerous individuals including Judah Feinerman, Rocco Veloccia, Gerard Brown, Henry Vogel, Seymour Schlessel, William Leone, Vito Tropiano, Les Erber and Edward Golebiewski (Tr. 285-288). These orders were placed by Constantinou with several brokerage firms, including First Florida (Tr. 288).

The credible evidence also showed that as part of his scheme to manipulate the price of Keystone stock, Constantinou, without any authority whatsoever, purchased 110,000 shares of Keystone stock in the name of Muriel Grant approximately one month before the unauthorized trade

that is the subject of this litigation (Tr. 81–84).

In mid-to-late-March 1985, Grant had spoken to his mother about the possibility of purchasing Keystone stock, and she authorized him to purchase up to one-half million dollars worth of Keystone (Tr. 81). Grant then spoke to Constantinou, gave him information relating to his mother's bank account and social security number and insisted that Constantinou speak again to Grant before actually purchasing any stock (Tr. 81). According to Grant, he did not give Constantinou authority to purchase any stock at that time (Tr. 81).

At the end of March, shortly after Grant's conversation with Constantinou, Muriel Grant received confirmation slips bearing the name of brokerage firms T.L. Anderson & Company and Edward Viner & Company showing that a purchase of 110,-000 shares of stock in the amount of $1,125,177.50 had been made in her name (Plaintiff's Exhibits 11, 12). At that time Grant did not know anyone at T.L. Anderson or Viner and, according to Grant, neither he nor his mother had placed the order reflected in the confirmations (Tr. 82). Upon receiving these confirmation slips from his mother, Grant spoke to Constantinou about the purchase. Constantinou indicated that it was a mistake and that he would "take care of it." Grant sent the confirmation slips back pursuant to Constantinou's instruction (Tr. 82), and there were no further communications with either Viner or T.L. Anderson (Tr. 82–84). Based upon the credible evidence presented at trial, evidently Constantinou had previously engaged in the conduct of which he has been accused in this action—purchasing stock for an account belonging to a member of the Grant family without authorization.

After the trade for his mother's account was resolved, Grant continued to visit Constantinou and continued to discuss Keystone with him (Tr. 85). On one of those occasions, Grant was introduced to Rikki Slovis who, at that time, was in Constantinou's office at 225 Park Avenue assisting with a syndication of a company called Memory Metal (Tr. 85). Constantinou explained that First Florida would soon be opening an office in New York and would share Constantinou's suite until First Florida was able to set up a new office downtown (Tr. 86–87). Constantinou indicated that Slovis was to be the manager of that office and was going to work directly under his control (Tr. 86).

It is undisputed that for at least several weeks prior to April 29, 1985, First Florida shared Constantinou's offices at 225 Park Avenue, for which it paid no rent (Stipulated Fact No. 4). During that time, Constantinou did work directly with Rikki Slovis, gave her orders on behalf of himself, his own accounts and other persons and even dictated First Florida's commission rates (Tr. 276–78, 207). Upon receiving purchase instructions from Constantinou, Slovis would execute the trade with a market maker whose name Constantinou often gave her (Tr. 92–93). After executing such a trade, Slovis' practice was immediately thereafter to telephone First Florida's office in Florida with information pertaining to the trade, including the name of the stock, the quantity bought and sold, the price and the person for whose account the trade was made.

Constantinou testified that he would in many instances place orders directly with Slovis without telling her whose account those orders were purportedly for (Tr. 276). Slovis learned the identity of the accounts for whom such purchases were made only after the purchase had been executed.

In addition to this unique method of executing trades, the free office space which First Florida received, and the manner in which Constantinou was permitted to set the commission rate, Constantinou testified that he would provide certain underwritings, such as Keystone, to First Florida and would refer brokers to First Florida (Tr. 329–30). First Florida would sell the underwritings to clients that Constantinou recommended through those brokers (Tr. 330). In return, First Florida and Peter Christos, head of syndication at First Flor-

ida, would receive underwriting warrants for the stock that was sold (Plaintiff's Exhibit 27; Christos Dep. 119). This arrangement existed despite the fact that Constantinou told Christos that because of some "problems" Constantinou was not able to obtain a broker's license and was barred from the securities business. This entire arrangement between First Florida and Constantinou raises serious questions about the credibility of the witnesses who worked at First Florida during the period relevant to this action and later testified at trial.

As previously mentioned, Grant authorized two purchases of Keystone stock in April 1985, one for his mother Muriel and the other for himself. According to Grant's testimony, both orders were given by Grant to Constantinou and Constantinou placed each order with First Florida (Tr. 112). According to Grant, Constantinou directed Slovis to purchase the shares for Grant's account, and at least one of the transactions was executed in Grant's presence. *Id.* Slovis testified, however, that both orders—for Muriel's account and for Grant's account—were received directly from Grant while he was in the offices of First Florida (Tr. 173, 175). The first of these purchases took place on April 8, 1985, when Grant opened an account at First Florida in the name of Muriel Grant and purchased 50,000 shares of common stock in Keystone to be delivered against payment to an account maintained by Muriel at Hutton (Tr. 87; Stipulated Fact Nos. 7, 10). Upon receiving instructions for such a purchase, First Florida purchased 50,000 shares of Keystone stock for Mrs. Grant's account, at a price of 10¼ per share. Approximately one week later, First Florida delivered those shares to Hutton for payment (Tr. 87; Stipulated Fact No. 11). Since Grant had notified Hutton that these shares would be delivered and had made arrangements for margin credit for Muriel's account so there would be funds available to cover the purchase, Hutton paid for these shares through the DTC (Tr. 10–11; Stipulated Fact No. 11).

On April 15, 1985, Grant instructed Constantinou to open a First Florida account in his own name and authorized the purchase of 20,000 shares of Keystone Medical for his behalf (Tr. 90–91; Stipulated Fact Nos. 8, 10). According to Grant, Constantinou then, in Grant's presence, called Slovis and told her to purchase the stock, from whom she should purchase it, and how much stock to purchase at a time (Tr. 90). Grant also observed Slovis purchasing the stock, which was accomplished in several transactions on April 15 and 16 at prices ranging from 11⅝ to 12⅛ per share (Tr. 90–91; Stipulated Fact No. 12). On April 26, First Florida delivered these shares for payment to Hutton through DTC. Again, since Grant had notified Hutton that these shares were coming and had made arrangements for sufficient funds to be transferred from his mother's Hutton account to his own Hutton account, Hutton paid for these shares without objection (Tr. 11–13; Stipulated Fact No. 13).

Following these purchases of Keystone, Grant visited Constantinou's office approximately three or four mornings a week to follow developments in Keystone, in which both he and his mother by this time had large positions (Tr. 93). During this period, Grant observed Constantinou purchasing large amounts of Keystone stock by placing purchase orders directly with Slovis. Frequently, Constantinou would give purchase orders to Slovis without telling her for whose account the purchase had been made. This information would be provided after the trade was executed.

According to Grant's testimony, by about April 25, 1985, Grant had concluded that he no longer believed Constantinou's optimistic predictions for Keystone (Tr. 97, 101). On April 25, Grant informed Constantinou that he planned to begin selling the Keystone stock that he and his mother had purchased (Tr. 97). On April 26, Grant went to Hutton's office in Stamford and spoke to Gramaglia, his Hutton broker (Tr. 98). Following the opening of the stock market, Grant gave various sell instructions to Gramaglia and sold 31,300 shares of Keystone stock from Muriel's account at

prices ranging from 14 to 14⅜ (Tr. 17, 98; Plaintiff's Exhibit 3).

On April 28, 1985, Grant left New York City for a convention at the Miramar Hotel in Santa Barbara, California, where he stayed until May 5 (Stipulated Fact No. 14; Tr. 100). While in California, Grant continued to follow the market for Keystone and placed telephone calls to First Florida, Constantinou and others at the offices at 225 Park Avenue and to Gramaglia. Only one of these calls, however, was to the telephone number maintained by First Florida. The other calls were to various other numbers in the offices occupied by Constantinou and his associates at 225 Broadway. Grant continued to sell stock while he was in California and instructed Gramaglia to sell stock from his account and his mother's account on April 29, April 30, May 1 and May 2 (Tr. 17–20, 98; Plaintiff's Exhibits 3, 4). During the period of April 26 to May 2, Grant sold the following amounts of Keystone stock at the following prices (Tr. 17–20; Plaintiff's Exhibits 3, 4):

| Date | Shares Sold | Selling Price | Seller |
|---|---|---|---|
| April 26 | 20,000 | 14 | Muriel |
| April 26 | 10,500 | 14¼ | Muriel |
| April 26 | 800 | 14⅜ | Muriel |
| April 29 | 2,700 | 14⅝ | Muriel |
| April 29 | 5,000 | 14⅞ | Muriel |
| April 30 | 1,000 | 15 | Muriel |
| May 1 | 10,000 | 15 | Muriel |
| May 2 | 1,000 | 11 | Grant |
| May 2 | 100 | 12¾ | Grant |
| May 2 | 500 | 11⅛ | Grant |
| May 2 | 500 | 13⅛ | Grant |

According to Grant, on Monday April 29—at a time when Grant was indisputably selling Keystone stock in his Hutton account—Grant received a telephone call from Constantinou who said that he wanted to buy 25,000 shares of Keystone stock for Muriel's account (Tr. 101). In no uncertain terms, Grant told Constantinou that he could not make such a purchase. Grant unequivocally testified that while he was in California he never authorized Constantinou to purchase any stock in Keystone Medical on either his behalf or his mother's behalf (Tr. 103–04). Nor did he discuss any purchase of Keystone stock with anyone at First Florida (Tr. 103–04).

On the night of May 5, 1985, Grant returned from California and found a confirmation slip from First Florida in his mail indicating a purchase of 25,000 shares in Keystone for his account (Stipulated Fact No. 18). Upon seeing this confirmation slip, Grant sent a mailgram to First Florida and asked Western Union to have it delivered no later than 9:00 Monday morning (Tr. 108). That mailgram, which is dated May 6, 1985 at 7:27 a.m., stated, *inter alia*, that:

> Last night May 5, I returned from California where I have been since April 28, 1985. Upon opening my mail, I discovered buy slips for 25,000 shares of Keystone Medical Corp. Please correct your records immediately, as I have never authorized anyone from your firm to purchase these securities on my behalf.

During the trial, Slovis and Constantinou contended that Grant had authorized Constantinou to purchase the 25,000 shares on his behalf and that on April 30 Grant confirmed that order directly with Slovis. This testimony is at odds with other testimony received during the trial and is extremely difficult to believe for a number of reasons. First, and most important, Grant's purported authorization to purchase Keystone stock on April 29 seems impossible to reconcile with the indisputable fact that between April 26 and May 2 Grant was selling Keystone stock on behalf of both himself and his mother at Hutton. During that period, the Grants sold 52,100 shares of Keystone stock. It is therefore difficult for this Court to believe that during that same period Grant would have authorized the purchase of 25,000 shares of Keystone.

But, even if for some unknown reason, Grant saw fit to buy Keystone shares for his own account at the same time he was selling them for his mother's account, there was no conceivable reason for him to proceed in the way defendants claim he did. During the trial, it was revealed that Grant has substantial wealth, and considerable experience in securities transactions. Surely he was aware of the possibility of transferring shares from one securities account

to another. In order for the Court to accept as true the testimony of the witnesses called on behalf of First Florida and Constantinou, the Court would have to believe that Grant pursued a course of conduct which was devoid of economic sense. Specifically, the Court would have to believe that, rather than transferring shares from his mother's account to his account, he sold the shares for his mother's account, thus incurring sizeable commission fees, and then purchased such shares for his own account, incurring additional broker's fees. The Court has been presented with no evidence indicating why Grant would have acted in this irrational manner, and therefore must presume that Grant acted as a reasonably experienced person would have under the circumstances. This makes the allegations by Constantinou and Slovis impossible to believe.

Slovis' testimony that Grant called her on April 30 to confirm a purchase on his behalf is further belied by the testimony of Steven Kaye. Mr. Kaye, who was a trainee at First Florida during April 1985, testified that he received a telephone call from Grant, who had called him in his role as Kaye's sponsor in Alcoholics Anonymous (Tr. 369–70). Kaye testified that he distinctly remembered that call because "I knew [Grant] was very busy out there. I knew he was conducting business. And it was just very special to me that he thought of me during his day to give me a call in the office" (Tr. 370). Kaye testified that he received that call around lunch time.

The telephone records of the Miramar Hotel in Santa Barbara, California show only one telephone call from Grant's room to First Florida's telephone number at 225 Broadway during Grant's stay in California. This call occurred at 12:20 p.m. New York time, which is consistent with Kaye's testimony. Kaye's testimony thus contradicts the testimony of Slovis that she received a call from Grant on the telephone number belonging to First Florida on April 30 confirming the 25,000 share purchase.

The Court found Mr. Kaye's testimony to be persuasive, and was impressed by his apparent sincerity. Although Kaye maintained very close ties with Grant stemming from Grant's sponsorship of Kaye in Alcoholic's Anonymous, Kaye was also indebted to Constantinou, who had arranged for his job at First Florida. His testimony in favor of Grant, therefore, is entitled to great weight.

The claim of First Florida, Constantinou and Slovis is further belied by the irregularities in First Florida's contemporaneous records which fail to reflect any purchase on Grant's behalf. The order ticket for the trade in question (Plaintiff's Exhibit 21) originally stated that the purchase was for Muriel Grant, not Perry Grant (Stipulated Fact No. 15). Muriel's name is in the handwriting of David Williams, the First Florida employee whose responsibility it was to complete the order ticket based on information received on the telephone from Slovis and who completed the order ticket on April 29 in the ordinary course of business (Stipulated Fact Nos. 6, 15). Subsequently, the order ticket was altered by crossing out the name Muriel and inserting the name "Perry" (Stipulated Fact No. 16). This alteration was not in the handwriting of David Williams, the person whose job it was to make such entries (Stipulated Fact No. 16) and was made after the ticket left Williams' possession (Williams Dep. 55–57).

In addition to the fact that First Florida's contemporaneous order ticket did not reflect a trade for Grant's account until it was altered under mysterious circumstances, Slovis' own chronological notebook (Plaintiff's Exhibit 25) failed to reflect that the trade of 25,000 Keystone shares on April 29 was for Grant's account. The column in Slovis' notebook which was designed for entry of the customer's name for each trade was left blank for this particular trade in Keystone stock. Nor was there any notation, memorandum, or other record of the alleged April 30 telephone call from Grant to Slovis in which Grant allegedly confirmed the purchase (Tr. 241).

Furthermore, the trial testimony of Constantinou and Slovis was somewhat inconsistent with Constantinou's prior deposition testimony. At his deposition, Constantinou testified three times that on April 29 he had only one conversation with Slovis in which he gave Slovis instructions to purchase the 25,000 shares of Keystone stock for Perry Grant's account and that he never mentioned the name Muriel to Slovis in connection with this purchase (Tr. 281–283). At trial, Constantinou and Slovis claimed that on April 29 Constantinou had three conversations with Slovis instead of one. In the first conversation, Constantinou purportedly told Slovis to buy 25,000 shares without telling her for whose account the purchase was to be made. In the second conversation, he purportedly told Slovis the purchase was for Muriel Grant. In the third conversation, he purportedly told her the trade was for Perry Grant.

Constantinou has alleged that Perry Grant authorized him to purchase the stock for Grant's own account. Constantinou did not claim at any time during the trial that Grant ever gave him authority to make this purchase for Muriel's account. If Constantinou's claim is true—that Grant authorized him to purchase the stock for Grant's personal account—it is unlikely that Constantinou would have initially told Slovis that the trade was for Muriel's account.

Constantinou's background must be noted. On April 22, 1975, Constantinou was enjoined by the SEC from having any association with a broker, dealer, investment company or investment advisor as a result of multiple violations of the securities laws in his capacity as President of Provident Securities, Inc., a registered broker-dealer. The SEC found that Constantinou "controlled and manipulated the market for the stock of Fantastic Fudge, Inc., and effected transactions to create the false and misleading appearance of an active market for such stock." SEC Release No. 11362, 6 SEC Docket 721 (April 22, 1975). In a subsequent, unrelated proceeding, the SEC permanently barred Constantinou from associating with any broker-dealer, as a result of his involvement in other schemes.

SEC Release No. 11562, 7 SEC Docket 505 (August 5, 1975). The SEC sanctions followed Constantinou's conviction on September 17, 1973 for unlawfully, wilfully and knowingly extending, maintaining and arranging for the extension of credit on securities in contravention of Regulation T. Constantinou received a suspended sentence and was placed on probation for a period of two years and fined $1,000. *United States v. Pericles Constantinou,* 73 Cr. 260 (S.D.N.Y.1973).

This trial was also not the first court appearance for Perry Grant, who had been convicted of five counts of mail fraud and securities fraud a number of years ago. *United States v. Grant,* 462 F.2d 28 (2d Cir.1972).

The Court did not use these prior convictions in weighing the credibility of these witnesses. The Court did, however, consider Constantinou's past record in evaluating the arrangement between Constantinou and First Florida, whose employees were aware of Constantinou's past misdeeds.

*Summary and Conclusions of Law*

■ The credible evidence at trial demonstrated that Hutton never agreed to pay First Florida for the 25,000 shares of Keystone at issue here, that Hutton never received authorization from Grant to accept or pay for the shares (Tr. 23), that Grant did not have sufficient funds in his Hutton account to pay for the trade (Tr. 45) and that Hutton reclaimed the Keystone shares to First Florida promptly, consistent with industry custom and practice and DTC rules (Tr. 59–61). First Florida has conceded that if it were confronted with a DVP trade for which it had received no authorization from its customer, it too would refuse to accept the trade precisely as Hutton did here (Tr. 195). First Florida is not legally entitled to retain Hutton's funds simply because First Florida's well-timed withdrawal from DTC prevented Hutton from ultimately reclaiming the stock to First Florida.

■ The credible evidence presented in this case further indicates that Grant did not authorize the purchase. On April 26, 1985 Grant became a seller, not a purchaser of Keystone stock. Evidently, Constantinou purchased the 25,000 shares without authorization, as he had evidently done with Muriel Grant once before, as part of his "war with the shorts."

■ First Florida maintains, however, that it was entitled to rely on Constantinou's apparent authority to purchase Keystone on Grant's behalf, even in the absence of the confirming telephone call. Unlike express authority—which is given by a principal directly to his agent—apparent authority is conferred by the conduct of a principal which justifies a third party's belief that an agency relationship exists. The Restatement (Second) Agency § 27 provides:

> Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

■ It is well-settled under New York law that a party who seeks to assert an agency relationship, and charge a principal with a contract made by his agent, must show the Court that the principal has conducted himself in a manner which gives the third party reason to believe that the act in question is one the principal has authorized. *P.D. Marchessini & Co. (New York) v. H.W. Robinson & Co.*, 287 F.Supp. 728, 732 (S.D.N.Y.1967). First Florida thus bears the burden of proving that Grant had somehow conveyed the impression to employees at First Florida that Constantinou was authorized to act as his agent when Constantinou ordered the purchase of the Keystone stock. It has not sustained that burden. Indeed, even if First Florida did not have this burden, it would still not prevail on this agency theory. An examination of the testimony of Slovis—who received the order from Constantinou and

executed it—clearly shows that at the time the transaction was executed, Constantinou lacked the authority and even the appearance of authority to instruct Slovis to execute the trade on behalf of Grant.

■ Slovis' testimony is that when she received the instructions from Constantinou on April 29, 1985 she did not know for whose account the shares were being purchased. During the execution of the trade, she was informed by Constantinou that he would let her know the name later. At that moment, Slovis did not know for whose account the shares were intended, nor did Slovis have any indication that an agency would be averred by Constantinou.

Further, in arguing that Constantinou had apparent authority to place the trade on April 29, First Florida relies on Grant's two prior purchases, one for his mother's account, the other for his own. The evidence concerning these prior trades is wholly insufficient, however, to establish that employees at First Florida believed that Constantinou had any apparent authority to make subsequent trades for Grant because First Florida's own witness, Rikki Slovis, testified that she took her instructions for the two prior trades directly from Grant, not Constantinou. It is, therefore, difficult for First Florida to maintain that they were misled by Grant into believing that Constantinou had authority to make subsequent purchases for him.

First Florida points to the two prior trades made by Grant with Constantinou's assistance as evidence that Constantinou had "control" over that account and as confirmation of the existence of Constantinou's apparent authority (First Florida Mem. 9–10). First Florida states that those trades were "placed not by Grant, but by Constantinou acting on Grant's behalf." *Id.* Yet Slovis, who made the trades for First Florida, testified unequivocally that Grant was present in the office then shared by Constantinou and First Florida, when she placed the trades and that she relied on Grant's personal instructions for these pur-

 

chases, not those of Constantinou (Tr. 173–175).

The law in New York is quite clear that one who wishes to rely on an agent's apparent authority must be able to point to particular instances of "misleading conduct" by the principal which gives a false impression that the putative agent had authority to act for him. *General Overseas Films, Ltd. v. Robin International, Ltd.*, 542 F.Supp. 684, 689 (S.D.N.Y.1982) (the doctrine of apparent authority "is invoked only when the principal's own misleading conduct is responsible for the agent's ability to mislead"); *Karavos Compania v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir.1978).

Here, Slovis' own testimony that Grant placed both prior trades himself precludes First Florida from prevailing on this legal theory, since according to her own recollection of the prior trades, Grant had done nothing to give her the false impression that Constantinou was empowered to act on Grant's behalf. Further, it is hard to imagine how First Florida can assert that it executed the trade in reliance on Constantinou's apparent authority to trade on behalf of Grant when, by Slovis' own admission, she did not know on whose behalf the trade at issue was being made when she took the order from Constantinou and executed it.

 In delivering the Keystone shares to Hutton through DTC and obtaining Hutton's funds in payment for those shares through DTC, First Florida implicitly represented that it was acting as Grant's broker or agent and had authority from Grant to enter into that transaction. Since First Florida has not sustained its burden of proving that it did in fact have such authority from Grant, First Florida has breached its implied warranty that it had such authority and is liable to Hutton for the damage that Hutton incurred. 11 N.Y.Jur.2d, Brokers § 40 ("A broker impliedly warrants his authority to act for his principal. Where he enters into a contract with a third person on terms not authorized or in excess of his authority, he may be held liable for breach of such warranty on repu-

diation of the contract by his principal."); *First National Bank of Chicago v. Jefferson Mortgage Co.*, 576 F.2d 479 (3d Cir. 1978) (broker liable for acting outside the scope of its authority); *Wittenberg v. Robinov*, 9 N.Y.2d 261, 213 N.Y.S.2d 430, 173 N.E.2d 868 (1961); *Harriss v. Tams*, 258 N.Y. 229, 179 N.E. 476 (1932).

### Conclusion

For the reasons outlined above, judgment is hereby entered in favor of Hutton against First Florida in the amount of $223,250, representing the difference between the amount First Florida obtained from Hutton through DTC less the amount Hutton realized from its sale of the stock in mitigation of damages, plus interest. Judgment is also entered on behalf of First Florida against Constantinou in the same amount.

So ordered.