UNITED STATES of America,
Appellee,

v.

Robert W. ELLIS, Appellant.

No. 515, Docket 71–1992.

United States Court of Appeals,
Second Circuit.

Argued Feb. 16, 1972.

Decided May 12, 1972.

R. David Broiles, Fort Worth, Tex., for appellant.

Richard J. Davis, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., and Peter F. Rient, Asst. U. S. Atty., New York City, on brief), for appellee.

Before FEINBERG and TIMBERS, Circuit Judges, and THOMSEN, District Judge.*

TIMBERS, Circuit Judge:

Robert W. Ellis appeals from a judgment of conviction after a four day jury trial in the Southern District of New York, Constance Baker Motley, *District Judge,* finding him guilty of three counts of violating the federal bank robbery statute, 18 U.S.C. §§ 2113(a), (b) and (d) (1970), including armed bank robbery. Ellis was sentenced to concurrent five year terms of imprisonment. On appeal, he contends that the district court erred in admitting evidence seized in violation of his Fourth Amendment rights, in admitting hearsay evidence,

* Of the District of Maryland, sitting by designation.

and in not permitting him to exhibit his voice to the jury. Finding no error, we affirm.

## I.

Viewing the evidence most favorably to the government, as we must at this juncture, United States v. D'Avanzo, 443 F.2d 1224, 1225 (2 Cir.), cert. denied, 404 U.S. 850 (1971), the proof at trial adequately supported Ellis' conviction.

At approximately 11:30 A.M. on March 1, 1968, three armed and masked men entered the County Trust Company in White Plains, New York, and robbed it of $7,000. While the three robbers were inside the bank, a fourth member of the gang parked a stolen 1965 Chevrolet next to the bank's drive-in window in such a way as to block the view into the bank. The two culprits who entered the bank through the rear door were arrested shortly after the robbery while fleeing from the scene of the crime. They subsequently were identified as John Havanick and Joseph D'Amico.[1] The person who parked the stolen automobile in such a way as to impede observation of the robbery was never identified.[2] The government produced evidence and the jury found that Ellis was the first robber into the bank, the one who entered through the front door.

The government's case against Ellis was based entirely upon circumstantial evidence, as the robbers' ski masks precluded any of the bank's employees or customers from identifying Ellis as one of the robbers.

Approximately ten minutes after the robbery, Patrolman Byrne arrested D'Amico a short distance from the bank. Byrne found keys to a Ford Thunderbird owned by Janet Cestaro, Ellis' girl friend, in D'Amico's pocket. Just minutes before arresting D'Amico, Byrne had seen someone who resembled Ellis walk past him.

At approximately noon on the day of the robbery, the stolen Chevrolet was found in a parking lot near the bank. Among the items found in the car was a suede jacket. In one pocket of the jacket was an address book inside of which was D'Amico's driver's license. The address book contained the name "Duke", which was Ellis' nickname. An address book with a similar listing also was found on Havanick at the time of his arrest.

Shortly after 2:00 P.M. on the day of the robbery, the police found Cestaro's Thunderbird, the keys to which had been in D'Amico's pocket, in the same parking lot where the Chevrolet had been located. A watch belonging to Ellis was found in the Thunderbird.

At trial Janet Cestaro testified that at the time of the robbery Ellis was virtually living with her in her apartment in West Haven, Connecticut, and that two of his friends were Havanick and D'Amico.

Late in the evening of February 29, 1968, the night before the robbery, Ellis, D'Amico and a third man, identified only as Mack, met at Cestaro's apartment. There, at Ellis' request, Cestaro agreed

---

1. On March 11, 1968, an indictment was filed charging Ellis, D'Amico and Havanick with three counts of robbing the White Plains bank on March 1, 1968, in violation of 18 U.S.C. §§ 2113(a), (b) and (d) (1970). Because of injuries sustained in a serious automobile accident, Ellis' trial was severed from that of his co-defendants on May 10, 1968. Ellis' trial was delayed for more than three years to permit him to recover from the automobile accident.

 On May 20, 1968, Havanick entered a plea of guilty to Count 1 of the indict-

ment. After a jury trial, D'Amico was found guilty on all three counts of the indictment on May 23, 1968.

2. It is not altogether clear whether the driver of the stolen automobile was male or female. During the course of the robbery, the driver shouted to the robbers in the bank to hurry. Witnesses inside the bank agreed that the driver's voice sounded like that of a woman. However, the driver of the car parked behind the stolen Chevrolet testified that he believed the driver was a man.

to lend her car to D'Amico and gave him the keys to it.

At approximately 7 A.M. on the day of the robbery, D'Amico called Cestaro's apartment and spoke to Ellis. At about 8 A.M., Ellis, who was then unemployed, left the apartment with Mack. Ellis wore a light tan trenchcoat, similar to the coat worn by the first robber to enter the bank and found near the bank moments after the robbery. Ellis took with him a revolver of the same color as that of the .32 caliber revolver abandoned by the fleeing robbers near the scene of the crime.

Before leaving the apartment, Ellis reminded Cestaro to tell anyone who asked about her car that she had lent it to D'Amico. When FBI agents came to see her after discovering her car, she told them that D'Amico was her boyfriend and that she had given him the car. While the agents were at her apartment, she received a phone call from Ellis who told her to say that her car had been stolen while she was shopping. When Cestaro told him she had company, Ellis replied "[d]on't say who this is, don't give them my name."

On March 2, the day after the robbery, Cestaro gave the FBI Ellis' belongings which were in her apartment, including a half-filled box of .32 caliber bullets identical to the ones found in the .32 caliber revolver abandoned near the bank. The government also presented evidence to show that Barbara Colligan, another of Ellis' girl friends, later went to the New Haven YMCA and picked up Ellis' belongings, including some bullets identical to those found in Cestaro's apartment and in the abandoned revolver.

## II.

Ellis' first contention is that the court erred in denying his pre-trial motion to suppress the admission of his watch seized from Janet Cestaro's automobile. While conceding that the police had probable cause to search the car, Ellis argues that no exigent circumstances justified a warrantless search. We disagree and hold that appellant's Fourth Amendment rights were not violated.

The facts surrounding the search and seizure of Cestaro's automobile are as follows. Shortly after the bank robbery, Detective Tricarico discovered the stolen Chevrolet with its motor running in a parking lot near the bank. When he returned to the police station and learned that a set of Ford keys had been found in D'Amico's possession at the time of his arrest, the detective returned to the parking lot. At about 2:00 P.M., he began trying to fit the keys in the doors of the Ford cars parked there. After approximately six unsuccessful attempts, he found that one of the keys opened the door of a white Thunderbird. Detective Tricarico looked into the glove compartment where he found a car registration in the name of Janet Cestaro. While inside the car, he saw a watch, bearing Ellis' initials, lying on top of the console between the two front seats. Tricarico then examined the trunk of the car. At approximately 5:00 P.M., after the car had been towed from the scene and taken into police custody, an FBI agent checking the car for fingerprints found and seized the watch.

The legality of the warrantless search and seizure of Cestaro's car turns on the validity of the initial search and seizure of the car at 2:00 P.M. If that initial warrantless intrusion was proper, the deferred search of the car three hours later by the FBI also was lawful. Chambers v. Maroney, 399 U.S. 42, 52 (1970); United States v. Castaldi, 453 F.2d 506, 510–11 (7 Cir. 1971); United States ex rel. Spero v. McKendrick, 409 F.2d 181, 184 (2 Cir. 1969).

■ As for the legality of the initial search, the general rule is that all warrantless searches, even when based on probable cause, are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Here we believe the facts surrounding the search of Cestaro's Thunderbird

bring this search within the "automobile exception" to the warrant requirement.

■ In Carroll v. United States, 267 U.S. 132, 153 (1925), the Supreme Court recognized that there is

> "a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

The Supreme Court has repeatedly reaffirmed *Carroll* and upheld warrantless searches of automobiles when probable cause exists.[3] It is of course true that *Carroll* and its progeny do not authorize in every conceivable situation the search of an automobile even with probable cause without the extra protection afforded by a warrant. See Coolidge v. New Hampshire, 403 U.S. 443, 461–62 (1971); Chambers v. Maroney, *supra*, 399 U.S. at 50. Rather, the underlying rationale of the "automobile exception" is that exigent circumstances justify the warrantless search of an automobile, when there is probable cause, where "the opportunity to search is fleeting. . . ." Chambers v. Maroney, *supra*, 399 U.S. at 51.

■ In the instant case, the opportunity to search Cestaro's automobile was fleeting. It is true that, unlike the cases in which the Supreme Court has upheld warrantless searches of automobiles, Cestaro's Thunderbird was not stopped while in motion on a public highway. See Coolidge v. New Hampshire, *supra*, 403 U.S. at 458–60. Nevertheless, at the time Detective Tricarico searched the automobile two of the rob-

bers were still at large. If Tricarico had waited for a warrant, it is not inconceivable that the unapprehended culprits could have driven away in the automobile, using a second key, thus preventing the police from recovering potentially valuable evidence.[4] Moreover, an additional factor indicating that the opportunity to search was fleeting is the possibility that the automobile could have been taken or ransacked by vandals or persons acting for the defendants while the police were securing a warrant. While the police could have avoided these problems by placing the automobile under guard, a special police detail would have been impractical at a time when police manpower was being drained in an attempt to find the two robbers still at large. Cf. Chambers v. Maroney, *supra*, 399 U.S. at 52; United States v. Castaldi, *supra*, 453 F.2d at 509.

We also believe that it is significant that Tricarico was not searching the automobile merely for evidence against suspects already in custody. Rather, he undoubtedly thought that the automobile contained evidence which might aid in the apprehension of the two criminals still at large and that waiting for a warrant might enable them to evade capture. Furthermore, in view of the fact that the robbers had abandoned their revolvers while fleeing from the bank, it was possible that the automobile contained weapons which the robbers might recover to assist them in their escape.

These considerations satisfy us that this search falls within the exception to the warrant requirement carved out by *Carroll* and its successors. We are buttressed in this view by a recent decision of the Seventh Circuit upholding a warrantless search under similar circumstances. United States v. Castaldi, 453 F.2d 506, 509–11 (7 Cir. 1971).

---

3. Husty v. United States, 282 U.S. 694 (1931); Brinegar v. United States, 338 U.S. 160 (1949); Chambers v. Maroney, *supra*.

4. The fact that the police did not have probable cause to believe the auto contained contraband did not invalidate the search. *Carroll* and its progeny also justify warrantless searches of automobiles, when there is probable cause, for evidence of crimes. See Chambers v. Maroney, *supra*, 399 U.S. at 62 n. 7 (concurring opinion of Harlan, J.).

We do not believe that Coolidge v. New Hampshire, *supra,* upon which Ellis strongly relies, requires a different result. There Coolidge was arrested with a warrant, and the police, acting pursuant to an invalid warrant, searched and impounded his automobile which was parked in the driveway on his property. The Supreme Court held that the search could not be justified under the "automobile exception" to the warrant requirement. The Court noted that the police had known for some time prior to Coolidge's arrest that his car probably had been used in the crime. Thus, there had been ample time to apply for a valid warrant. Moreover, Coolidge had given no indication of fleeing with the vehicle during the previous two weeks of the investigation. Furthermore, at the time of arrest, Coolidge's wife left the house at the request of the police, and the house was placed under guard, effectively precluding the possibility that the car or the evidence inside might be tampered with while the officers took time to secure a warrant. Finally, unlike the situation here, in *Coolidge* there was "no alerted criminal bent on flight, . . . no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile." 403 U.S. at 462. Thus, *Coolidge* is sufficiently distinguishable that here, unlike there, we would not be distorting the rationale of *Carroll* and its progeny by upholding the warrantless search and seizure.

Ellis similarly argues that the district court erred in admitting against him the bullets found in Cestaro's apartment, claiming that they also were the fruits of an unreasonable search. This claim likewise is without merit.

The facts surrounding the search of Cestaro's apartment were fully developed at a pre-trial hearing before Judge Pollack on April 12, 1968.[5] At about 4:30 P.M. on March 2, 1968, Janet Cestaro was arrested by the FBI in connection with the robbery. She was fingerprinted and photographed, but, for some unexplained reason, she was not presented before a United States Commissioner. Several FBI agents began interrogating her about 6:00 P.M. They showed her an advice of rights form. Cestaro, a college senior, indicated that while she understood her rights she did not want to sign the form before talking to her lawyer, whom she was unable to contact. At approximately 7:00 P.M., her parents arrived and were given an opportunity to speak to her. During the course of the interrogation, which was not continuous, Cestaro also was offered food. She eventually agreed to tell the FBI everything she knew. Shortly before 9:30 P.M., she informed the agents that Ellis kept some belongings in her apartment. She then executed a form allowing the agents to search her apartment. After being released from custody, Cestaro took the agents to her apartment, let them in with her key and gave them Ellis' belongings, including the bullets.

 As previously noted, the starting point for a discussion regarding the legality of a warrantless search is the principle "that a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions . . . ." Coolidge v. New Hampshire, *supra,* 403 U.S. at 474-75. It long has been recognized that consent to a search justifies a warrantless intrusion. Frazier v. Cupp, 394 U.S. 731, 740 (1969); United States v. Cataldo, 433 F.2d 38, 40 (2 Cir. 1970), cert. denied, 401 U.S. 977 (1971). It also is well established that where one's right to occupancy or possession is equal or superior to another's, his consent to a search is sufficient to make the search lawful. Frazier v. Cupp, *supra,* 394 U.S. at 740; United States v. Gargiso, 456 F.

---

5. Judge Pollack denied Ellis' motion to suppress the admission of the bullets found in Cestaro's apartment. Ellis' motion to suppress this evidence was renewed at trial. Judge Motley also denied this motion, concluding that Cestaro had consented to the search.

2d 584, 586–87 (2 Cir. 1972); United States v. Cataldo, *supra,* 433 F.2d at 40. Since the apartment was rented to Cestaro and her roommate, Virginia Damiano, and since Ellis' belongings were in Cestaro's bedroom, her consent, if voluntary, would authorize the warrantless intrusion. See United States v. Airdo, 380 F.2d 103, 106 (7 Cir.), cert. denied, 389 U.S. 913 (1967).

■■ There was ample evidence to support Judge Pollack's and Judge Motley's findings that Cestaro had validly consented to the search. She was fully advised of her right not to permit the intrusion. There is no evidence indicating that her consent was coerced. While Ellis suggests that Cestaro's consent was induced by improper promises on the part of the FBI agents, the record does not support this supposition. Furthermore, while consent is not to be lightly inferred, the mere fact that a suspect is under arrest does not negate the possibility of a voluntary waiver of Fourth Amendment rights. United States ex rel. Lundergun v. McMann, 417 F.2d 519, 521 (2 Cir. 1969); United States v. Smith, 308 F.2d 657, 663–64 (2 Cir. 1962), cert. denied, 372 U.S. 906 (1963). In view of these circumstances, we decline to hold that the district court erroneously concluded that Cestaro had voluntarily consented to the search.

■ Ellis claims that Janet Cestaro could not waive his constitutional protection against unreasonable searches and seizures, because in turning over his belongings to the FBI she was acting as an instrument of government agents, complying with a demand made by them. The record, however, does not support

Ellis' interpretation of the facts. Testimony presented at the pre-trial hearing in 1968 indicated that Janet Cestaro volunteered the information that Ellis kept belongings at her apartment. Moreover, as discussed above, there is no reason to believe that she was coerced into agreeing to give these items to the government. That Cestaro wished to remove suspicion from herself by full cooperation and disclosure does not make her a government agent. As the Supreme Court said in Coolidge v. New Hampshire, *supra,* 403 U.S. at 488, "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals". Accordingly, we hold that Cestaro was not acting as an instrument of the government in turning over Ellis' belongings to the FBI agents.[6]

■ Ellis also maintains that a receipt signed by Barbara Colligan, which showed that she had picked up some bullets belonging to Ellis at the YMCA, was inadmissible since it was the product of an illegal search. Ellis essentially contends that the FBI found the bullets in his room at the YMCA during an unlawful search and then, with the intention of using it later at trial, prepared the receipt for signature by whoever might come to pick up Ellis' belongings. There is no evidence that the FBI conducted any search or caused the removal of the bullets and other material from Ellis' room. One of the New Haven FBI agents testified at the trial and was not asked any questions about the claimed search; nor was any other witness produced or questioned on this point.

---

6. In light of this holding, it is not at all clear that there even was a search and seizure within the constitutional meaning of those terms, as Janet Cestaro voluntarily went to the clothes hamper, fetched the bullets from the hamper and handed them to the agents. See Coolidge v. New Hampshire, *supra,* 403 U.S. at 487. However, during the pre-trial hearing, the agents referred to this incident at Cestaro's apartment as a search. It is possible that the agents searched the entire apartment even after she had given them the bullets. Since the admission of the bullets was proper whether the incident is or is not deemed a search and seizure, we have followed Judge Motley's lead and treated it as a search and seizure within the constitutional meaning of those terms.

Ellis, moreover, is precluded from attacking the validity of this alleged search by his failure to file a pre-trial motion for the suppression of evidence pursuant to F.R.Crim.P. 41(e). See United States v. Bennett, 409 F.2d 888, 901 (2 Cir. 1969), cert. denied sub nom. Haywood v. United States, 396 U.S. 852 (1970); United States v. Weldon, 384 F.2d 772, 775 (2 Cir. 1967). Defense counsel was in regular contact with Colligan (a defense witness) and Ellis prior to trial. There is no reason why the legality of this alleged search could not have been raised in advance of trial.

### III.

Ellis next contends that the receipt signed by Barbara Colligan for the bullets she picked up at the YMCA was improperly admitted against him, because it was hearsay. This claim also is without merit.

The facts surrounding the admission of the YMCA receipt are as follows. Barbara Colligan, the principal defense witness who was living with Ellis at the time of trial, testified that on the day of the robbery Ellis had been with her at 11:30 A.M. in New Haven, Connecticut. On cross-examination, she testified that she later had gone to the New Haven YMCA to pick up Ellis' belongings:

"Q. Did there come a time when you went to the YMCA in New Haven to pick up some of Mr. Ellis' belongings?

A. Yes.

\* \* \*

Q. Did you give a receipt to the person at the YMCA for the belongings that you picked up?

A. I signed, yes. A signed receipt.

Q. Showing you Government's Exhibit 56 for identification, can you identify that?

A. That is my signature.

Q. What is your answer, that this is your signature?

A. Yes.

Q. Is this the receipt that you left at the Y at that time?

A. I believe so. I can only say that is my signature."

The prosecutor then read the receipt to the jury. The receipt reflected the fact that she had picked up some clothes and eighteen .32 caliber bullets identical to those found in Cestaro's apartment and in the revolver abandoned near the scene of the crime. The government argued that the receipt was admissible to show Colligan's bias and motive in testifying in Ellis' favor, as Ellis would entrust the task of picking up his belongings only to someone whom he trusted. The prosecutor, however, also used the receipt to prove the truth of the matter asserted therein. During summation, the government relied on the receipt as affirmative proof of the fact that Barbara Colligan had actually picked up the bullets. Moreover, the court instructed the jury that "[w]hat we have here is a receipt signed by Barbara Colligan showing that she picked up the bullets." [7]

Under the circumstances of this case, we hold that the receipt was properly admitted to show that Barbara Colligan had picked up the bullets at the YMCA. Ellis' argument that the receipt was hearsay overlooks the well established rule that when a witness specifically reaffirms the truth of something he has said elsewhere, the earlier statement constitutes evidence as fully as what he says on the stand. United States v. Nuccio, 373 F.2d 168, 172 (2 Cir.), cert. denied, 387 U.S. 906 (1967); United States v. Borelli, 336 F.2d 376, 391 (2 Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960 (1965). Here, while the trial record is somewhat ambiguous, it does appear that Barbara Colligan's trial testimony indirectly acknowledged not only that it was her signature, but also that she picked up the various items contained in the receipt. Accordingly, the district

---

7. The bullets themselves were never introduced in evidence.

court properly ruled that the receipt was not hearsay.[8]

■ Ellis also contends that the address books belonging to Havanick and D'Amico, which contained his name, and a driver's license in the name of Joseph D'Amico found in one of these address books, should have been excluded as hearsay. The flaw in this argument is that address books belonging to one defendant, containing names of other defendants, are not hearsay and are admissible as circumstantial evidence showing association. United States v. Cusumano, 429 F.2d 378, 381 (2 Cir.), cert. denied, 400 U.S. 830 (1970); United States v. Bennett, *supra*, 409 F.2d at 895 n. 6; United States v. Armone, 363 F.2d 385, 404 (2 Cir.), cert. denied, 385 U.S. 957 (1966). Furthermore, D'Amico's driver's license, found inside his address book, also was not hearsay. It was not offered for the truth of the matter asserted therein, but rather as circumstantial evidence to show that D'Amico was the owner of the address book and the coat in which the book and the license were found.

### IV.

Finally, Ellis contends that the district court erred in not permitting him to exhibit his voice to the jury.

During the course of the trial, two witnesses who were in the bank at the time of the robbery described the voice of the first robber to enter the bank, the one whom the government claimed was Ellis. While Ellis chose not to testify in his own behalf, defense counsel requested the court to permit him to say some unspecified words to the jury to enable them to compare his voice with that described by the two witnesses. The court denied the request. Under the cir-

cumstances of this case, this denial was not an abuse of the court's discretion.

The testimony regarding the quality of the first bank robber's voice was indeed sparse. Marie Raneri, a bank teller, testified that this robber had a "normal" voice with no accent. Edward Clark, the bank manager, described the voice differently:

"Q. Would it be fair to say that as you heard the voice of the first man to come through the door, that he had a deep, commanding voice?

A. Yes.

Q. When you say a deep, commanding voice, would you characterize that as a voice deeper than my own?

A. Not substantially."

While three other witnesses who were in the bank at the time of the robbery testified a trial, none of them described the first bank robber's voice.

■ In view of this limited and conflicting testimony about the quality of the robber's voice, the jury had no rational basis for comparing Ellis' voice in 1971 with the ambiguous description of how the first robber's voice sounded in 1968. Accordingly, the proffered exhibition had no probative value, as the testimony did not indicate that the robber had a particularly distinctive voice. The court therefore did not abuse its discretion in not permitting Ellis to exhibit his voice to the jury.

In any event, even assuming the court erred, the resulting error surely was harmless. Since the suggested exhibition had at best slight probative value, we can say with fair assurance, "after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not swayed by error. . . ." Kotteakos v. United States, 328 U.S. 750, 765 (1946).

Affirmed.

8. There is nothing to the contrary in P.D. Marchessini & Co., Inc. v. H. W. Robinson & Co., Inc., 287 F.Supp. 728 (S.D.N.Y. 1967), aff'd, 394 F.2d 121 (2 Cir. 1968), upon which Ellis relies. There the district court excluded as hearsay a document which a witness had testified was in his handwriting and was signed by him. 287 F.Supp. at 731. That case is distinguishable, as the witness apparently did not acknowledge the truth of the matters asserted in the document. Moreover, the document in that case contained merely self-serving statements.