COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Haley and Senior Judge Annunziata
Argued at Alexandria, Virginia


CHRISTOPHER LEE BENTLEY

MEMORANDUM OPINION* BY
v.      Record No. 1804-03-4         JUDGE ROSEMARIE ANNUNZIATA
                                       AUGUST 16, 2005
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael P. McWeeny, Judge

Dawn M. Butorac, Senior Assistant Public Defender (Office of the
Public Defender, on brief), for appellant.

Josephine F. Whalen, Assistant Attorney General (Jerry W.
Kilgore, Attorney General, on brief), for appellee.


Christopher Bentley contends on appeal that the trial court committed reversible error in

admitting into evidence a personally recorded compact disc (CD) containing on its face a

handwritten list of musical groups.  He also claims the Commonwealth's "circumstantial evidence

was not sufficient to establish beyond a reasonable doubt that [he] committed the larceny of the

property of Mr. Markos and Ms. Monks."  For the reasons that follow, we disagree and affirm the

trial court.

I.  Background

The Commonwealth indicted Bentley on four counts of burglary and four counts of grand

larceny.  Specifically, he was charged with:  burglarizing Tim Young's house on November 18,

2002, and stealing his property; burglarizing George Markos's house on November 25, 2002, and

stealing his property; burglarizing JoAnn Monks's house on or about December 4 or December

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

5, 2002, and stealing her property; and burglarizing Evelyn Merritt's house on December 5, 2002, and stealing her property. A jury found Bentley guilty of burglarizing Merritt's house, stealing her property, stealing Markos's property, and stealing Monks's property. It acquitted him of the three other burglaries and of stealing Young's property. This appeal concerns the larceny of property from Markos and Monks.

### The Theft of Markos's Acura

Reviewed in the light most favorable to the Commonwealth, the party prevailing below, Garcia v. Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003), the evidence established that Fairfax County Police Officer James Urie responded to Stonepath Circle in Centreville on November 25, 2002, after a resident found a pile of property sitting in a grassy area next to a townhouse. Urie found a driver's license in the pile and contacted George Markos, who lived in the townhouse complex with his fiancée.

Markos identified property in the pile belonging to him, his fiancée, and his fiancée's daughter. Markos then realized that his 1996 Acura was missing from the parking lot. He testified that he "always leaves [his cell phone] in the front . . . of the car between the seats because [he] do[es]n't have any need for it any other place but in the car in case of an emergency." Police recovered Markos' car a few weeks later. His cell phone and CDs were missing, and, although Markos did not smoke, the "car was full of cigarettes." Markos also found an unfamiliar CD in his car's CD player, which he provided to police. Markos reviewed his cellular phone bill for the period following the theft of his car and identified several telephone calls that were placed from his cellular phone with which he was not familiar and which he denied making.

Shortly after midnight on December 3, 2002, police found Markos's stolen Acura parked in the Red Roof Inn parking lot. Located next door to the Red Roof Inn is the Brookside Motel.

- 2 -

Officer P.M. McCurry testified that officers "set up" surveillance around the car and investigated whether any guests at the Red Roof Inn claimed the car. Unable to locate anyone at the Red Roof Inn with an Acura, McCurry made inquiries to guests at the Brookside Motel. Bentley and his girlfriend, Fanta Jackson, were in Room 5. Bentley "seemed hesitant to speak to" the officers and immediately "took out a cigarette and lit it."

Officer M.P. Goodley participated in the surveillance of the Acura. He processed and searched it after surveillance terminated. He noticed "the ashtray was full of cigarette butts and ashes, which Mr. Markos stated that wasn't his." Ultimately, Goodley released the Acura to Markos.

Detective Michael Motafches obtained a record of telephone calls made by Bentley from the detention center after his arrest. He compared the records from the detention center with Markos's cellular telephone records and found six different numbers that were on both phone records. Motafches testified that "forty-five phone calls made from [Markos's] cell phone . . . matched [one of those six] numbers [on] the jail [telephone record]." Moreover, Bentley placed eight hundred twenty-five calls from jail to one of the six different numbers contained on Markos's phone record. On cross-examination, Motafches said he "learned Bentley's name as a suspect through contacting some of the numbers called on [Markos's] cell phone" after it was stolen.

The Theft of Monks's Palm Pilot

Around 9:30 a.m. on December 5, 2002, a police officer telephoned Evelyn Merritt and advised her that her car had been involved in a hit-and-run accident. Merritt checked her garage and discovered her garage door was open and her 1993 green Honda Accord was gone. She testified that her car was in the garage the preceding night, that she left the garage door open a few inches so her cat could come inside, and that she left the keys and the remote control for the

- 3 -

alarm inside the car. The garage is attached to the house. After the police contacted Merritt, she and her husband went to Reston to identify her car. Merritt found "a pair of yellowish gloves in the back seat which were not [hers]" and a "palm pilot" on the front seat which was not hers.

Helena Villareal is the on-site manager of Glendale Condominiums. Between 7:00 a.m. and 7:30 a.m. on December 5, 2002, Villareal was outside 2332 Freetown Court in the Glendale complex when she saw Merritt's green Honda pull out of a parking space, "hit [a] white Chevrolet and keep going." The man driving the Honda wore a gray sweatshirt, and his hair was loose. Villareal, who was twenty feet away, viewed the Honda's license plate number. Fifteen to twenty minutes later, she again saw the green Honda parked on the other end of the property in another visitor lot. Villareal saw Bentley get out, use the alarm to lock it and proceed up the sidewalk. After he walked away from the car, Villareal checked the license number and noticed it was the same car involved in the hit and run. Villareal said she was familiar with Bentley because "he's on the property all the time." Moreover, Bentley looked at Villareal as he exited the Honda and proceeded to 2322 Freetown Court, where his girlfriend, Fanta Jackson, and her father live. Villareal walked to the door of Jackson's residence and noticed the footprints went up to the door. After the police were contacted, officers brought Bentley outside, and Villareal identified him. Villareal testified she had "[n]o doubt" Bentley was the man she saw exit Merritt's Honda. Although Villareal did not see the driver that hit the Chevrolet, she testified that Bentley wore a gray sweatshirt similar to the one she saw the driver wearing earlier.

Officer Chris Lehmann testified that Bentley wore "blue jeans and a grey sweat shirt." He told Lehmann "he had been inside and wasn't involved in any accident, and he wasn't driving any car." Lehmann asked Bentley to follow him outside to determine if Villareal could identify him. Shortly thereafter, Lehmann placed Bentley under arrest for grand larceny.

- 4 -

Officer Mark Simmons testified that Villareal positively identified Bentley as the person who had operated Merritt's stolen Honda. Simmons inspected the interior of Merritt's stolen Honda and recovered "a palm pilot" located on the front passenger seat. However, it did not belong to Merritt.

On the morning of December 5, 2002, Joann Monks discovered that her key rack, purse, and tote bag were missing from her residence at 2450 Freetown Court. Monks explained that the "gate door that opens to the garage door onto the street was not closed," and the door that leads from the garage to the kitchen was not locked. Monks testified that her purse contained her wallet, jewelry, cosmetic case, and palm pilot. Police found Monks's palm pilot in Merritt's Honda.

Detective Motafches testified that the distance from Jackson's residence to Monk's residence was four-tenths of a mile. He also determined that Merritt's residence was approximately twelve miles away from the residences of Jackson and Monks.

ADMISSION INTO EVIDENCE OF COMPACT DISC

A.  Facts Relating to Admitting the Compact Disc

Bentley contends the compact disc was inadmissible hearsay and, thus, improperly admitted.

During the Commonwealth's case-in-chief, Markos testified that he found a CD in his car's CD player after police returned it to him. He provided it to police. The CD was not a factory-recorded CD, but was individually recorded, or burned, and contained a handwritten list of musical groups on its face, one name being the Northeast Groovers.

Jackson testified at trial that the police came to her house around 9:00 a.m. on December 5, 2002, and spoke with her and Bentley. Jackson stated that Bentley arrived at her home around 10:45 p.m. on December 4, 2002, and remained there until the police arrived the next morning.

- 5 -

Jackson testified that Bentley's "hair was braided" at the time. When asked how she and Bentley got to the Brookside Motel on December 3, 2002, Jackson said they took a train.

During cross-examination by the Commonwealth, Jackson identified the "Northeast Groovers" as "a go-go band." Although Jackson had heard that band, she testified that she "do[es]n't listen to go-go." The Commonwealth then asked if Bentley "listen[s] to the Northeast Groovers," to which Jackson replied, "He may, but he don't listen to it around me. He respects me. I don't listen to it."[1]

In the Commonwealth's case on rebuttal, Officer Goodley identified the CD he received from Markos. When the Commonwealth moved to admit the CD into evidence, the following colloquy transpired:

> MS. BUTORAC [Defense Counsel]: The item is a CD that was taken from [Markos's] car. On it is written Northeast Groovers and some other things that I don't remember right now, but it's handwritten. It's not as if that's the CD that came from the company and that's what's stamped on the CD. It's written. It's hearsay what's on it. It's hearsay what's written on it.
>
> There's nothing to - - I mean it's for the truth because Mr. Fitzpatrick [the prosecutor] cross examined Ms. Jackson on that particular name and it's hearsay because it's for the truth of what it says, that that's a record of what that CD is.

---

[1] Viewing Jackson's testimony in the light most favorable to the Commonwealth, as we must, we conclude the trier of fact did not have to accept Jackson's testimony that they took a train to the motel, nor did it have to accept her equivocal response that he "may" listen to the Northeast Groovers. Rather, it could properly have concluded, obversely, that Jackson lied about arriving by train and resolved her equivocal answer to whether Bentley listened to the Northeast Groovers against him. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). The trier of fact is not required to believe all aspects of a witness' statement or testimony. Rather, it may reject that which it finds implausible, and accept other parts that it finds believable. Durham v. Commonwealth, 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973). Furthermore, a defendant's exculpatory evidence may be treated, by inference, as an attempt to conceal guilt. See Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001); Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998).

- 6 -

MR. FITZPATRICK: Two points, Your Honor. One, it's for impeachment purposes of Ms. Jackson. She stated that she - - she was unequivocal, "I didn't go to the Brookside or the Red Roof Inn in a car." She said that she recognizes that name and that she - - that [when] Chris Bentley listens to it, "I tell him to turn it off."

I think that rebuts it. I think that's a circumstance that places her in the car as well with him. Furthermore, Your Honor, I would offer that the CD itself comes in. That's the condition of it. I don't think the Commonwealth - - if it were to offer a manufacturer-made CD is not required to bring someone here from Warner Brothers or whatever one of the other companies are to say, "We imprinted that on there."

I mean it's a fact. It's a verbal fact. It's not - - it's not an out of court assertion that the hearsay rule is meant to protect. It's a factual thing that is on the CD.

Bentley's attorney reiterated, "[i]t's hearsay. It's an out of court statement for the truth of the matter asserted that that's what's on the CD." In addition, defense counsel argued that the CD "doesn't have anything to do with impeaching [Jackson's] testimony because there's nothing to impeach. She said she's familiar with the music and that Chris [Bentley] may listen to it, but they weren't doing it that day."

The trial court "overrule[d] the [hearsay] objection" and admitted the CD.

B. Discussion and Analysis

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988).

"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."

Donahue v. Commonwealth, 225 Va. 145, 151-52, 300 S.E.2d 768, 771 (1983) (quoting

Stevenson v. Commonwealth, 218 Va. 462, 464-65, 237 S.E.2d 779, 781 (1977) (citing

- 7 -

McCormick on Evidence § 246, at 584 (2d ed. 1972))). See also Taylor v. Commonwealth, 28 Va. App. 1, 9-10, 502 S.E.2d 113, 117 (1998) (*en banc*) (citation omitted) (reiterating similar definition).

We hold that the handwritten CD label does not constitute hearsay because it was not offered "'as an assertion to show the truth of the matters asserted therein'" and does not rest "'for its value upon the credibility of the out-of-court asserter.'" Donahue, 225 Va. at 151-52, 300 S.E.2d at 771 (citations omitted). Rather, the CD was offered into evidence as an additional circumstance from which the jury could infer that Bentley had been in the car where the CD was found. See Church v. Commonwealth, 230 Va. 208, 212, 335 S.E.2d 823, 826 (1985) (holding that a minor female's statement that sex is "'dirty, nasty, and it hurt'" was admissible because it was not offered to prove that sex is, indeed, "dirty and nasty," but rather because it served "as *circumstantial evidence* tending to establish the probability" that the defendant raped the girl (emphasis added)); see also, United States v. Day, 591 F.2d 861, 883-84 (D.C. Cir. 1978) (noting that "neutral" statements offered to show association and not the truth of the matters asserted are not hearsay); United States v. Snow, 517 F.2d 441, 443-45 (9th Cir. 1975) (holding that a piece of tape found on a gun case bearing the defendant's name was not hearsay and was properly admitted as circumstantial evidence to show that defendant knowingly possessed the unregistered weapon); United States v. Ellis, 461 F.2d 962, 970 (2nd Cir. 1972) (holding that a driver's license containing a co-conspirator's name was not hearsay because it was not offered to prove the truth of the matter asserted, i.e. that the driver's license was accurate and valid as to the codefendant; rather, the driver's license was offered "as *circumstantial evidence* to show that [the codefendant] was the owner of the address book and the coat in which the . . . license [was] found" (emphasis added)). Whether the CD, in truth, contained music by the "Northeast Groovers" is of no moment. The CD title is probative, circumstantial evidence from which an

inference may be properly drawn that Bentley was in the car.  See Horne v. Milgrim, 226 Va. 133, 139, 306 S.E.2d 893, 896 (1983) ("Any fact, however remote, that tends to establish the probability or improbability of a fact in issue is admissible.").  Thus, the evidentiary value of the words written on the CD is not a function of who wrote them or whether they are accurate or true.  See Taylor, 28 Va. App. at 9-10, 502 S.E.2d at 117.  Stated differently, it mattered not whether the CD, in fact, was a recording of the Northeast Groovers; its label reflecting music that Bentley listened to circumstantially provided an evidentiary link to Bentley's presence in the car, irrespective of the truth of the matter asserted.  Markos avowed that the CD did not belong to him; therefore, the fact finder was permitted to infer that appellant placed a CD labeled Northeast Groovers in the car from which he stole Markos's cellular phone.

Given the conclusion that the CD and the words "Northeast Groovers" are not hearsay and the broad discretion we afford the trial court in evidentiary matters, we affirm the trial court's decision to allow the CD into evidence.  See United States v. Anello, 765 F.2d 253, 261 (1st Cir. 1985).[2]

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONVICTIONS FOR THE THEFT OF MARKOS'S CAR AND THE PALM PILOT

### A.  Standard of Review

When the sufficiency of the evidence is challenged on appeal, the appellate court reviews the evidence that tends to support the conviction and upholds the conviction unless it is plainly

---

[2] The record does not make clear whether the challenged evidence was, arguably, improperly admitted for its impeachment value or properly admitted, as we hold here, as circumstantial evidence tending to prove that Bentley drove the stolen vehicle to the motel.  The distinction is not material to the result under "the time-honored principle of evidence law that, in general, if evidence is admissible for any purpose, it is admissible."  Hanson v. Commonwealth, 14 Va. App. 173, 183, 416 S.E.2d 14, 20 (1992); see also Rosenberg v. Mason, 157 Va. 215, 236, 160 S.E. 190, 197 (1931) (noting "cardinal rule of evidence that evidence relevant and material for one purpose is not rendered inadmissible for that purpose by the fact that it is inadmissible for some other purpose"); Gonzales v. Commonwealth, 45 Va. App. 375, 388 n.5,

wrong or lacks evidentiary support. Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998). "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." Id. at 520, 499 S.E.2d at 265.

It is well established that "once the crime is established, the unexplained possession of recently stolen goods permits an inference of larceny by the possessor." Bright v. Commonwealth, 4 Va. App. 248, 251, 356 S.E.2d 443, 444 (1987). For the larceny inference to arise, the Commonwealth must prove that the accused was in exclusive possession of the recently stolen property. Best v. Commonwealth, 222 Va. 387, 389, 282 S.E.2d 16, 17 (1981). "This inference from the recent, unexplained, possession of stolen property may, by itself, support a conviction of larceny." Montague v. Commonwealth, 40 Va. App. 430, 437, 579 S.E.2d 667, 670 (2003) (citing Bright, 4 Va. App. at 251, 356 S.E.2d at 444).

### B.  Discussion and Analysis

#### Monks's Palm Pilot

Bentley contends he "did not have knowing and intentional possession of the palm pilot found in" Merritt's stolen car. He argues its presence in Merritt's car failed to sufficiently link him to the stolen item. Alternatively, he contends, "it was not [him] driving the car, he was instead inside the apartment building all night as Ms. Jackson testified and Ms. Villareal was mistaken in her identification."

We first note that Bentley's contention that he never drove Merritt's car is not at issue on this appeal. The jury convicted him of larceny of Merritt's car based, in part, on the eyewitness testimony of Villareal. Although Bentley raised that issue by petition, a panel of this Court

611 S.E.2d 616, 622 n.5 (2005) (*en banc*) (McClanahan, J., dissenting) (citing cases holding same).

denied the petition for appeal challenging the larceny conviction of Merritt's car. Therefore, for purposes of this appeal, his guilt for stealing Merritt's car was conclusively established.

Officer Simmons was the first officer to inspect and search Merritt's recovered car. He found Monks's palm pilot in plain view on the front seat of Merritt's car, the car which Bentley stole. Moreover, Monks's palm pilot was stolen about the same time Merritt's car was stolen, and both were recovered a short time after they were stolen. Monks lives only four-tenths of a mile from Jackson's residence, where Merritt's car was recovered. The evidence showed that Bentley was the only person in the car from the time Villareal saw him exit it to the time Simmons searched it and discovered the palm pilot. The fact finder determined beyond a reasonable doubt that Bentley exercised dominion and control over and stole Merritt's car. Given those facts, the jury was permitted to infer that Bentley also exercised exclusive possession over the palm pilot on the front seat. The Commonwealth's evidence was competent, was not inherently incredible and was sufficient to prove beyond a reasonable doubt that Bentley stole Monks's palm pilot.

The Acura

Police found Markos's Acura eight days after it was stolen in a parking lot adjacent to the Brookside Motel.

Bentley and his girlfriend, Fanta Jackson, were found in a motel room immediately adjacent to the area where the stolen car was recovered; officers at the motel noticed Bentley smoking cigarettes, and the car's ashtray was full of cigarette butts and ashes although Markos never smoked in it; Markos's cellular telephone was stolen along with the car; and finally, Markos's cellular phone was used, starting on the same day it was stolen with the car, to make forty-five calls to six numbers with which Markos was unfamiliar, the first of which was to

- 11 -

Jackson. Jail records showed that Bentley called those same six numbers more than eight hundred times over a three-month period while he was incarcerated.

Moreover, the jury was not required to believe Fanta Jackson's testimony that she and Bentley took a train to the motel. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995).

The Commonwealth presented credible, competent, and sufficient evidence to support the convictions; therefore, we cannot say those determinations were plainly wrong. Accordingly, we affirm Bentley's convictions.

Affirmed.

Benton, J., concurring and dissenting.

I agree that the evidence was sufficient to prove Christopher Bentley was guilty of larceny of JoAnn Monks's palm pilot. I dissent, however, from the holding concerning the other larceny conviction. I would hold that the writing on the compact disc was hearsay and that the trial judge erred in permitting the evidence. Because the error was not harmless, I would reverse Bentley's conviction for larceny of George Markos's car and remand for a new trial.

I.

In the Commonwealth's case-in-chief, Officer Goodley testified that he watched the stolen car for several hours to see if the thief would return to it. When no one approached the car, Officer Goodley released the stolen car to George Markos, the owner. He did not describe the car's contents or any other contacts with Markos.

Markos testified that when the police returned his car his compact discs were gone and a compact disc that did not belong to him was in the car. He testified that he gave that compact disc to the police. The prosecutor did not ask him to identify the compact disc and did not offer the compact disc in evidence during Markos's testimony or at any time during the Commonwealth's case-in-chief.

When Fanta Jackson testified in the defense case, the prosecutor asked the following questions on cross-examination:

> Q. Do you and Mr. Bentley in your relationship . . . listen to music?
>
> A. Do we listen to music?
>
> Q. Yes.
>
> A. Yeah, we listen to music.
>
> Q. Who are the Northeast Groovers?
>
> A. Who are the Northeast Groovers?

- 13 -

Q. Yes.

A. It's a go-go band.

Q. Where are they from?

A. I would hope Northeast.

Q. You've listened to them before?

A. I've heard of them. I don't listen to go-go.

Q. But you know who the Northeast Groovers are?

A. Yeah. They play them on the radio.

Q. You don't listen to it -- sometimes does . . . Chris Bentley, your boyfriend, does he listen to the Northeast Groovers?

A. He may, but he don't listen to it around me. We respect each other. I don't listen to it.

Q. So if it were in the car and he would turn it on, what would you tell him to do?

A. If we was in a car?

Q. Yes.

A. I wouldn't tell him to do nothing. If we was in a car, I probably would change the station, but he wouldn't do it.

Q. But you are familiar with that?

A. With what?

Q. With the Northeast Groovers?

A. Yeah.

As a witness in the Commonwealth's case-in-rebuttal, Officer Goodley testified for the

prosecutor about the compact disc and the handwritten words on its label:

Q. . . . [W]hat is that item and what does it say on it?

[Bentley's attorney]: Objection, Your Honor. Whatever that thing says on it would be hearsay.

THE COURT: Let's first identify it and we'll go from there.

- 14 -

Q. Do you recognize that item?

A. Yes, I do.

Q. Where did you receive -- from whom did you receive that item?

A. I received this from Mr. Markos, from the vehicle that was reported stolen at his residence.

The prosecutor argued that the evidence was offered for the following purpose:

Two points, Your Honor. One, it's for impeachment purposes of Ms. Jackson. She stated that she -- she was unequivocal, "I didn't go to the Brookside or the Red Roof Inn in a car." She said that she recognizes that name and that she -- that Chris Bentley listens to it, "I tell him to turn it off."

I think that rebuts it. I think that's a circumstance that places her in the car as well with him. Furthermore, Your Honor, I would offer that the CD itself comes in. That's the condition of it. I don't think the Commonwealth -- if it were to offer a manufacturer-made CD is not required to bring someone here from Warner Brothers or whatever one of the other companies are to say, "We imprinted that on there."

I mean it's a fact. It's a verbal fact. It's not -- it's not an out of court assertion which the hearsay rule is meant to protect. It's a factual thing that is on a CD.

The trial judge overruled the objection and permitted Officer Goodley to testify as follows:

Q. What is Commonwealth's [Exhibit] 15? What is that item?

A. It's a portable CD.

Q. What is stated there on the CD?

A. It states Northeast Groovers, Icebox, and it has a date of May 13th of the year 2000.

Q. Have you listened to this?

A. Yes, I have.

Q. What is on there?

A. Go-go music.

- 15 -

On cross-examination, the officer conceded "I was just going on what -- I don't know if its actually the Northeast Groovers . . . playing on there. I'm not familiar with go-go music."

"'Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.'" Donahue v. Commonwealth, 225 Va. 145, 151-52, 300 S.E.2d 768, 771 (1983) (citation omitted). See also Jenkins v. Commonwealth, 254 Va. 333, 339-40, 492 S.E.2d 131, 134 (1997). The principle is well established that hearsay evidence is incompetent and inadmissible unless it falls within one of the recognized exceptions to the hearsay rule. Coureas v. AllState Ins. Co., 198 Va. 77, 83, 92 S.E.2d 378, 383 (1956). "Statements otherwise objectionable as hearsay are not rendered admissible because they have been reduced to writing." Williams v. Morris, Administratrix, 200 Va. 413, 417, 105 S.E.2d 829, 832 (1958). Moreover, "[o]ne seeking to have hearsay declarations of a witness admitted as an exception to the general rule must clearly show that they are within the exception." Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (citation omitted).

At trial, the prosecutor contended the evidence was offered for impeachment of Jackson. The majority now asserts a proposition the Commonwealth has never argued -- that Bentley's attorney should have objected to the evidence on relevance grounds. The hearsay objection, however, was the appropriate objection when, as here, the prosecutor proffered that he was seeking to impeach Jackson's testimony. Jackson had testified she never listened to the Northeast Groovers and Bentley never listened to the group in her presence, if ever he listened to the group at all. Thus, the evidence's value as impeachment was non-existent unless it tended to establish that the compact disc was in fact a recording by the Northeast Groovers.

The inquiry whether an out-of-court declaration is hearsay first asks what the statement is offered to prove. Donahue, 225 Va. at 151-52, 300 S.E.2d at 771; Stevenson v. Commonwealth, 218 Va. 462, 465-66, 237 S.E.2d 779, 781 (1977); Hanson v. Commonwealth, 14 Va. App. 173, 187, 416 S.E.2d 14, 20 (1992). In this case, accepting the prosecutor's statement of purpose, the evidence necessarily was offered for the truth of the writing. The prosecutor sought to have the jury accept as true that the compact disc contained music by the Northeast Groovers because he wanted the jury to believe Jackson lied during her cross-examination. Thus, the only possible relevance of introducing the writing was to prove the truth of the writing's declaration, that "this is the music of the Northeast Groovers." In this case, it was exactly as though a person had said out of court, "This compact disc contains the music of the Northeast Groovers," and that statement were introduced in court. This is the very definition of hearsay. Furthermore, that this was the reason to introduce the writing was abundantly obvious because no other evidence proved what was recorded on the compact disc. "When the only possible relevance of an out-of-court statement is directed to the truth of the matters stated by a declarant, the subject matter is classic hearsay even though the proponent of such evidence seeks to clothe such hearsay under a nonhearsay label." Keen v. State, 775 So. 2d 263, 274 (Fla. 2000).

Indeed, the prosecutor also offered Officer Goodley's testimony on rebuttal to prove the truth of the writing: that the compact disc was a recording by the Northeast Groovers, as written on the label, and that it was "go-go" music. He testified that he listened to the compact disc and that it contained "[g]o-go music." Thus, the testimony of the Commonwealth's witness belies the assertion that the evidence was simply to prove "a verbal fact." We would adopt a fiction to conclude this testimony was offered to prove a "verbal fact" and not the content of the compact disc. I would hold that the Commonwealth used the words "Northeast Groovers" written to the compact disc to show the truth of the matter asserted: that the compact disc was a recording of

the Northeast Groovers, a go-go band. Thus, the trial judge erred by admitting this hearsay evidence.

II.

The Commonwealth contends that even if the trial judge erred in admitting the evidence, the error was harmless. I disagree.

When the erroneous admission of evidence is not of constitutional dimension, the standard for reviewing whether the record establishes harm to the accused is as follows:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). "[T]he principle of Kotteakos [means] that when an error's natural effect is to prejudice substantial rights and the court is in grave doubt about the harmlessness of that error, the error must be treated as if it had a 'substantial and injurious effect' on the verdict." O'Neal v. McAninch, 513 U.S. 432, 444 (1995) (quoting Kotteakos, 328 U.S. at 764-65, 776)). Indeed, the Supreme Court of Virginia has held that "error will be presumed to be prejudicial unless it plainly appears that it could not have affected the result." Caldwell v. Commonwealth, 221 Va. 291, 296, 269 S.E.2d 811, 814 (1980).

When, as in this case, a trial error has been shown on direct appeal from a conviction, the government bears the burden of proving harmlessness under this standard. See O'Neal, 513 U.S. at 437. The Commonwealth has not met this burden because its proof that Bentley stole Markos's car rested upon linking Bentley to each of three pieces of circumstantial evidence: cigarettes in the car, telephone calls from Markos's telephone, which was found in the car, and a

- 18 -

compact disc in the car. Individually, these pieces of evidence lacked the strength to prove beyond a reasonable doubt the inference of guilt the prosecutor sought to establish. Only by putting them together could the prosecutor create the three-legged stool upon which the Commonwealth's theory of guilt rested. Significantly, the evidence concerning the compact disc was the strongest of the three factors and was essential to the Commonwealth's proof.

The prosecutor relied upon speculation and conjecture to suggest the cigarettes established Bentley had been inside Markos's car. The evidence merely proved the ashtray in Markos's car "was full of cigarette butts and ashes." No evidence connected those cigarette butts or ashes to Bentley. Although the evidence proved Bentley smoked, no evidence proved either that he smoked the brand of cigarettes found in the car or that he had smoked in the car. Simply put, the evidence was not sufficient to take the connection "'out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference.'" Atrium Unit Owners Assoc. v. King, 266 Va. 288, 294, 585 S.E.2d 545, 548 (2003) (citation omitted). Without more, this evidence merely established that one or more of the many smokers in the universe was in the car.

The evidence concerning the calls from Markos's cellular telephone was not as illusory, but it also required the jury to speculate that Bentley had been inside the car. The testimony established that calls were made from Markos's telephone to a telephone in the residence occupied by Fanta Jackson and her father. The record does not indicate who made those telephone calls and certainly fails to exclude Jackson, her father, or any of their friends as the caller. Furthermore, the record fails to identify the persons or places called for any of the other five telephone numbers that were common to the list of numbers called from Markos's telephone and by Bentley while he was in the jail. In short, the evidence merely proved that whoever used Markos's telephone called persons or places that were known to Bentley. Thus, the persons who could have made the calls from Markos's telephone include Bentley, Jackson, her father, and the

- 19 -

friends and acquaintances of Bentley, Jackson, and Jackson's father. To suppose that this evidence connected only Bentley to the car "would be to engage in speculation and conjecture." Wright v. Commonwealth, 217 Va. 669, 670, 232 S.E.2d 733, 734 (1977).

The final support for this three-legged stool of inferences the prosecutor relied upon to prove guilt is the hearsay evidence. The written statement "Northeast Groovers" was inadmissible to prove the truth of the assertion that the disc was of the "Northeast Groovers" music. It was admitted for that evidentiary purpose, however, and used for that purpose. Although no evidence proved, except by innuendo, that the compact disc belonged to Bentley, the trial judge permitted the prosecutor to establish in his rebuttal case, under the guise of impeachment, that the disc found in Markos's car was a recording made by the "Northeast Groovers." When earlier cross-examined by the prosecutor, Jackson acknowledged that she knew that the Northeast Groovers was a "go-go band" and that the band's music is "play[ed] . . . on the radio." She testified, however, that she did not "listen to go-go" music, that Bentley "may" have listened to the Northeast Groovers, but that he never did so in her presence. On rebuttal an officer testified that it was "go-go" music but that he did not know if it was the Northeast Groovers.

The error in admitting the evidence was exacerbated by the prosecutor's use of the evidence and mischaracterization of Jackson's testimony when he argued to the jury as follows:

> I was unclear from her testimony as to whether or not [Jackson] said she went to the Brookside Motel by herself via the trains with Mr. Bentley or if they were apart. I'll let you decide that from your collective recollection.
>
> However, I asked her, "Are you familiar with the Northeast Groovers?"
>
> "Yes, I am." It's a go-go band and she associated it with Mr. Bentley. She said, "Chris listened to that stuff, but I don't listen to it. When it's on I tell him to turn it off."

> Then you had Officer Goodley in my rebuttal case offered it into evidence. What was found in Mr. Markos' car? A CD, Northeast Groovers. I would offer to you in that love that Fanta Jackson has for her boyfriend, I would suggest to you perhaps they arrived there together in that vehicle. Perhaps they arrived separately and Mr. Bentley drove there, but that car is there.

Even if we assume the mischaracterization was unintentional, and the prosecutor believed he had impeached Jackson's testimony (the record clearly shows Jackson did not testify that Bentley listened to the Northeast Groovers), the prosecutor's argument to the jury surely is that the disc contained music by the Northeast Groovers. Absent the use of this hearsay evidence, the stool that supported the chain of inferences that led the jury to convict would have collapsed. No evidence, other than the hearsay when combined with the prosecutor's mischaracterization of Jackson's testimony, established that Bentley even knew who the Northeast Groovers were, much less that he owned one of their compact discs. Jackson never testified she had personal knowledge that Bentley ever listened to the Northeast Groovers.

This is not a case, as posited by the Commonwealth, of overwhelming evidence of guilt. Furthermore, it is important to note, as the United States Supreme Court has observed, that an "emphasis and perhaps overemphasis, upon the [concept] of 'overwhelming evidence,'" has the effect of clouding the relevant question "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Chapman v. California, 386 U.S. 18, 23 (1967) (footnote and citations omitted). In other words, the principle is well established that a harmless error analysis is entirely distinct from a sufficiency of the evidence analysis. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Kotteakos, 328 U.S. at 765. Consistent with these principles, the Supreme Court of Virginia has held that even if "the other evidence amply supports the . . . verdicts, [error is not harmless when] the disputed

- 21 -

[evidence] may well have affected the . . . decision." <u>Cartera v. Commonwealth</u>, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978).  <u>See also</u> <u>Hooker v. Commonwealth</u>, 14 Va. App. 454, 458, 418 S.E.2d 343, 345 (1992) (holding that "a harmless error analysis . . . [is not] simply a sufficiency of the evidence analysis").

Because the inadmissible evidence was so profoundly a part of the Commonwealth's theory of prosecution (that Bentley had been in the car), I would hold that there exists a reasonable possibility it contributed to the verdict.  For these reasons, I would reverse the conviction for larceny of the car and remand for a new trial.